```
1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3
   UNITED STATES OF AMERICA
4
5                   Government.
6       v.                      Case No. 10-20346
7  DEMONDRE LEVELLE MARTIN
   MICHAEL DEON DAVIS,
8  DEAUNTE LORENZO PATRICK,
   ELRICO LAQUAN WELCH,
9
10                  Defendants.
   _____/
11
12
13                  MOTION HEARING
14
15      BEFORE THE HONORABLE GERALD E. ROSEN
              United States District Judge
16      733 US Courthouse & Federal Building
              231 Lafayette Boulevard West
17                  Detroit, Michigan
              Monday, December 13, 2010
18
19  APPEARANCES:
20
           JOHN O'BRIEN
21         JEANINE JONES
           Assistant United States Attorneys
22         231 W. Lafayette Blvd.
           Detroit, MI 48226
23         On behalf of the Government.
24  To Obtain a Certified Transcript:
   Carol S. Sapala, RMR, FCRR, CSR
25  313.961.7552
   www.transcriptorders.com
```

1

2

3     APPEARANCES (continuing):

4

5

6           SANFORD SCHULMAN
            500 Griswold Street
7           Detroit, MI 48226
            On behalf of Defendant Patrick.

8           MARK MAGIDSON
            2110 Penobscot Building
9           Detroit, MI 48226
            On behalf of Defendant Martin.

10
            MARIA MANNARINO
11          431 Gratiot
            Detroit, MI 48226
12          On behalf of Defendant Davis.

13          DAVID THOLEN
            Federal Defender Office
14          613 Abbott Street
            Detroit, Michigan 48226
15          On behalf of Defendant Welch.

16

17

18

19

20

21

22

23

24

25

                    Usa v Martin, et al 10-20346

1

2                    C O N T E N T S

3    IDENTIFICATION                                PAGE

4    _____

5

6    WITNESSES

7    RICHARD JURY

8    Direct Examination by Mr. O'Brien          6
     Cross Examination by Mr. Magidson         53
9    Cross Examination by Mr. Schulman         79
     Cross Examination by Mr. Tholen           84
10   Cross Examination by Ms. Mannerino        97
     Examination by The Court                 103
11

12   Certificate of Court Reporter            115

13

14

15

16

17

18

19

20

21

22

23

24

25

1              E X H I B I T S

2

3       _____

4    IDENTIFICATION                    RECEIVED

5

6    Government's Exhibit 1 and 1A
     audio and transcript 3-25-2010          53
7
     Government's Exhibit 2 and 2A
8    audio and transcript 4-7-2010           53

9    Government's Exhibit 3 and 3A
     audio and transcrpt 5-25-2010           53
10
     Government's Exhibit 4 and 4AA
11   audio and transcript 5-27-2010          53

12   Government's Exhibit 5 and 5A
     audio and transcript 5-12-2010          53
13

14

15

16

17

18

19

20

21

22

23

24

25

                 Usa v Martin, et al 10-20346

```
 1              Detroit, Michigan
 2              Monday, December 13, 2010
 3              1:40 p.m.
 4         THE LAW CLERK:  Calling case number 10-20346,
 5    United States of America versus Demondre Lavell Martin e
 6    al.
 7         THE COURT:  Appearances, please.
 8         MR. O'BRIEN:  John O'Brien on behalf of the United
 9    States.
10         MS. JONES:  Jeanine Jones, on behalf of the United
11    States.
12         THE COURT:  Good afternoon.
13         MR. SCHULMAN:  Sanford Schulman, on behalf of
14    Deaunte Patrick.
15         MR. MAGIDSON:  Mark Magidson on behalf of Defendant
16    Martin who's seated to my left.
17         MS. MANNERINO:  Maria Mannerino.
18         MR. THOLEN:  David Tholen, on behalf of Elrico
19    Welch who's present, Your Honor.
20         THE COURT:  We have the remaining the issue of
21    suppression arising out of the traffic stop on May 27,
22    right?
23         Mr. O'Brien, have you -- how many witness's have
24    you got for me today?
25         MR. O'BRIEN:  You're correct, Your Honor.
```

Usa v Martin, et al 10-20346

```
 1          THE COURT:  Agent Jury and Holt?
 2          MR. O'BRIEN:  Yes.
 3          THE COURT:  Who's going to handle this?  Mr.
 4    Magidson, it's, I think, your motion.
 5          MR. MAGIDSON:  My motion.  Yes, Your Honor.
 6          THE COURT:  Are you going to handle this?
 7          MR. MAGIDSON:  Yes, Your Honor.
 8          THE COURT:  Do you anticipate producing any
 9    evidence yourself?
10          MR. MAGIDSON:  No, Your Honor.
11          THE COURT:  All right.  Let's get going.
12          MR. O'BRIEN:  Thank you, Your Honor.
13          We'd call Agent Jury to the stand.
14          (Whereupon the witness was then sworn)
15          THE COURT:  Be seated please.
16          Give and spell your full name.
17                    DIRECT  EXAMINATION
18    BY MR. O'BRIEN:
19    Q    State your name and spell your last name for the
20    benefit of the Court Reporter.
21    A    Richard Jury.  J-u-r-y.
22    Q    Sir, you're employed how?
23    A    Special Agent with The Bureau of Alcohol, Tobacco
24    Firearms and Explosives.
25    Q    For how long?
```

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    A    Approximately, five years.

2    Q    Agent Jury, were you so employed throughout 2010?

3    A    Yes, I was.

4    Q    And during 2010, were you engaged in both an

5    undercover investigation as well as regular agent

6    responsibilities?

7    A    Yes, I was.

8    Q    Did the investigations that you were involved in,

9    include your working with an individual who was

10   referenced in Alcohol, Tobacco and Firearms documents

11   as CI-85?

12   A    Yes.

13   Q    And is CI-85 someone who you know to be an

14   individual by the name of Rabih Othman?

15   A    Yes.

16   Q    O-t-h-m-a-n.

17        Early in February 2010, did you have occasion to be

18   contacted by Mr. Othman?

19   A    Yes, I did.

20   Q    What was the nature of that conversation, if you

21   recall, sir?

22   A    I was -- I spoke to the C.I. who advised he had

23   spoken to an individual who we identified as Anthony

24   Pope, who advised that it was hard out there.

25        He needed to get his ski mask and firearms back out.

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   Q    At that point, had you asked this -- for purposes

2   of the hearing this afternoon, I'm going to refer to

3   him as CI-85.

4        Had you asked CI-85 to initiate any of that type of

5   discussion with Mr. Pope?

6   A    No, I did not.

7   Q    After being advised of that conversation between

8   Mr. Pope and CI-85, what action did you take next, if

9   any?

10  A    I instructed him to --

11  Q    So we're clear, you instructed who, sir?

12  A    Confidential informant.

13       I instructed the confidential informant if he came

14  back in contact with Anthony Pope, to speak with him to

15  see if he was actually serious concerning conducting a

16  home invasion.

17  Q    At some point -- if I might direct your attention

18  to 16th of February 2010.

19       Did you, again, have a chance to speak with CI-85?

20  A    Yes, I did.

21  Q    During the course of that conversation, did he

22  relay to you any information from Mr. Pope or did he

23  advise you whether or not he and Mr. Pope had a chance

24  to speak again?

25  A    He advised that he had spoke to Anthony Pope and

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    Anthony had instructed him if he knew of any narcotics

2    stash houses, to let him know, because he had a crew

3    of guys that could conduct a home invasion on the

4    narcotics house.

5    Q    In recalling your conversation with CI-85, was

6    that the term that was used in relating the

7    conversation with Mr. Pope or were there some slang or

8    terms of art that were used?

9    A    The word "licks" was used, which is commonly

10   known on the street to conduct some type of home

11   invasion.

12   Q    Are you familiar with slangs or terms used on the

13   street that represent a place where a substantial

14   amount of narcotics are sold?

15   A    That would be a stash house.

16   Q    If the amount of narcotics at a stash house rise

17   to a certain level, is there a term of art for that as

18   well?

19   A    If it's raised above a certain value, I would

20   just -- I would believe that it would be known as a

21   dope house or stash house.

22   Q    In your conversations with CI-85, were those

23   terms of art being used?

24   A    Yes, they were.

25   Q    Did he relay to you any other additional

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  information -- or let me ask it this way.

2      At the conclusion of your conversation with CI-85

3  on February 16th, what was your understanding of the

4  substance of what Mr. Pope's interests were regarding

5  this, this dope house?

6  A    He would be interested in utilizing a crew to

7  conduct an armed home invasion to split up the

8  proceeds of the narcotics that would be located inside

9  the stash house.

10 Q    Did you make any arrangements with the

11 confidential informant to provide your telephone

12 number to anybody at that time?

13 A    At that particular time, no.  I was unclear if

14 this would be a serious -- if Mr. Pope was being

15 serious or if he was just speaking out of turn.

16     And I asked him if he did come in contact again with

17 Mr. Pope, to contact me so we could look into it further.

18 Q    In your -- not originally, but in the

19 conversation with the confidential informant on

20 February 16th, was there any discussion that was

21 related to you regarding how anything taken from this

22 drug house would be divided by any or all of the

23 participants?

24 A    The initial discussion was that Anthony Pope,

25 along with the confidential informant, would take half

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  of the proceeds from the stash house and would split

2  it with the crew that actually conducted the armed

3  home invasion.

4  Q    Based on your conversation with the confidential

5  informant at that time, what was your understanding of

6  what the proceeds were likely to be that would be

7  taken from this stash house?

8  A    They were discussing in terms of kilograms of

9  cocaine.

10 Q    On February 20, 2010, are you aware of whether or

11 not the confidential informant received any other

12 communications from Mr. Pope or anybody else regarding

13 this potential home invasion?

14 A    On February 20, 2010, he advised me he spoke with

15 an individual by the name of Demondre Martin

16 concerning his -- him and a crew of his individuals

17 that he associated conducting an armed home invasion.

18 Q    Based on your conversation with the confidential

19 informant on February 20th, was your understanding

20 that this individual, Mr. Martin, had contacted the

21 confidential informant or the confidential informant

22 had contacted Mr. Martin?

23 A    He advised that he initially was told by Anthony

24 Pope that Demondre Martin wanted to contact him and he

25 reached out to Demondre Martin.

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   Q    Were people's names being used in these

2   conversation or nicknames or street names?

3   A    The nickname that was given for Demondre Martin

4   was Drè.

5   Q    Did you have occasion to meet with the

6   confidential informant on February 26th?  I'm sorry.

7   February 22, 2010?

8   A    Yes, I did.

9   Q    And at that time, did you have an opportunity to

10  review with him any pictures of any individuals that

11  you had identified as a result of your investigation?

12  A    Yes.  We showed two different photographs,

13  driver's license photographs of Anthony Pope and

14  Demondre Martin, who the confidential informant

15  advised -- identified the photographs of individuals

16  that he knew as Tony and Drè.

17  Q    Between February 22, 2010 and March 12, 2010, are

18  you aware, sir, or did you participate in any phone

19  calls in an attempt to set up a meeting with this

20  individual known as Drè or Demondre Martin?

21  A    Yes.

22       We arranged a meeting for March 12th of 2010 to --

23  for myself in an undercover capacity to meet with

24  Demondre Martin as well as with the confidential

25  informant.

Usa v Martin, et al 10-20346

                 Richard Jury-Direct Examination/Mr. O'Brien
                                  12-13-2010

1        THE COURT:  You say "we arranged."

2        Did you speak on this occasion directly to

3   Mr. Martin?

4        THE WITNESS:  No, I did not, Your Honor.  I --

5        THE COURT:  This was arranged through the C.I?

6        THE WITNESS:  Yes, sir.

7        I instructed the informant to contact Demondre

8   Martin on his cellular telephone.

9        THE COURT:  At this point, you still had not had

10  any contact whatsoever with Mr. Martin?

11       THE WITNESS:  No, I had not.

12  BY MR. O'BRIEN:

13  Q    The -- up to this point, Agent Jury, was there

14  any recordings of the telephone conversations that

15  were made or the in person conversations, if there

16  were any, between Mr. Pope and the confidential

17  informant or Mr. Martin and the confidential

18  informant?

19  A    No, there was not.

20  Q    Why's that?

21  A    Due to the impromptu phone calls or meetings with

22  the individuals and due to the fact I was unsure at

23  this point if these individuals were serious about

24  committing a home invasion, the informant did not have

25  recordings at the time of those initial contacts.

                    Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  Q    You said at some point there was a meeting

2  scheduled for the 12th of March 2010?

3  A    Yes, there was.

4  Q    Where was that location?

5  A    We set up the meeting at 3641 Grand River in

6  Detroit, Michigan, which is in the United Cafe parking

7  lot in Detroit.

8  Q    What time of the day was that meeting to take

9  place?

10  A    Approximately, 2:00.

11  Q    Did it, in fact, take place?

12  A    Yes, it did.

13  Q    Tell us about that.

14      Who was there?  How it is that you got there,

15  things of that nature.

16  A    I arrived at the location with the confidential

17  informant.

18      And shortly thereafter, I believe it would have been

19  20 to 30 minutes thereafter, Demondre Martin arrived that

20  location.

21  Q    Once Mr. Martin arrived that location, you

22  certainly we're able to see his face.

23      He wasn't masked or anything, was he?

24  A    No, he was not.

25  Q    Would you recognize him if you were to see him

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   again?

2   A    Yes, I would.

3   Q    Is he seated in the courtroom today?

4   A    Yes, he is.

5   Q    Tell Judge Rosen how's he dressed.

6   A    He's the individual on my far right at the

7   defense table in the yellow county jumpsuit.

8        THE COURT:  They're two individuals in the yellow

9   county jumpsuit.

10       THE WITNESS:  I apologize, sir.  The far end of the

11  table facing the individual with the blue tie.  Right

12  next to the individual with the blue tie.

13  BY MR. O'BRIEN:

14  Q    For purposes the record, is it the individual to

15  the right or the left on the far side of that table?

16  To your right, I'm sorry, or your left?

17  A    The individual on the far right facing me.

18  Q    Thank you.

19       When Mr. Martin arrived, how did he arrive?

20  A    He arrived in a black 2007 Ford Edge.

21  Q    Were you able to have a conversation with him at

22  that time?

23  A    Yes, I was.

24  Q    Where did that conversation take place?

25  A    In an undercover vehicle.

Usa v Martin, et al 10-20346

                    Richard Jury-Direct Examination/Mr. O'Brien
                                12-13-2010

1   Q    Is that the vehicle that you were in?

2   A    Yes, it was.

3   Q    Did Mr. Martin get inside of that vehicle or did

4   you get into his car?  How did that happen?

5   A    Mr. Martin got in the front passenger seat of the

6   vehicle.

7   Q    You said at that time the confidential informant

8   was with you at that time as well?

9   A    Yes, he was.  He was in the rear passenger seat

10  of the vehicle.

11  Q    At that time, did you and Mr. Martin have

12  additional conversation about this interest or

13  planning regarding a home invasion of a stash house?

14  A    Yes, we did.

15  Q    Generally, sir, what were the topics of

16  conversation between you and he at that time?

17  A    I advised Mr. Martin that I had been working for

18  an individual that was trafficking multiple --

19  multi-kilograms of cocaine into the area.  I was

20  unhappy with working with him.

21       And I was -- my intention was to find a crew that

22  would conduct an armed robbery of a narcotics stash house

23  when the next shipment came in.

24  Q    How did Mr. Martin respond to that information?

25  A    Mr. Martin advised he had a crew that would be

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    capable of doing that.  He was interested in

2    conducting a home invasion.

3    Q    During the course of your conversation with Mr.

4    Martin, did he provide you with any information about

5    himself, specifically, whether or not he had

6    experience in this arena or whether or not people that

7    he associated himself with were experienced in this

8    type of activity?

9    A    Yes.  During the conversation, I asked him

10   multiple times and stated multiple times I wanted

11   individuals that were experienced and were capable of

12   conducting an armed home invasion on this narcotics

13   stash house.

14       And he advised multiple times he was capable and his

15   crew was capable of conducting an armed home invasion.

16   Q    During the course of your conversation, was there

17   any discussion with Mr. Martin about this fictitious

18   home?

19       I trust the home that you advised you were working

20   for is fictitious?

21   A    Yes.

22   Q    About the amount of narcotics that you might

23   expect to find on any given delivery date?

24   A    Yes.  I explained that there would be typically

25   15 to 20 kilograms of cocaine present at the location.

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   Q    During the course of your conversation with Mr.

2   Martin, were there any discussions about how any of

3   the drugs or the drugs that would be taken from that

4   home would be divided?

5   A    We initially discussed on that occasion that we

6   would -- that could be worked out at a future date.

7        That I wanted -- but at that occasion, I wanted to

8   make sure it was worth my while.

9   Q    The vehicle that you were driving on

10  March 12, 2010, does it have the ability to record or

11  is it outfitted with any recording equipment to

12  capture this conversation between you and Mr. Martin?

13  A    Yes.  It has audio and video.

14  Q    And were they -- those particular pieces of

15  equipment functioning that day?

16  A    Yes,  they were.

17  Q    Were there audio and video recordings made

18  between -- the conversation between you and Mr. Martin

19  and CI-85, to the extent he participated?

20  A    Yes, there was.

21  Q    Have you had a chance to review either the

22  audiotape or videotape of that particular discussion?

23  A    Yes, I have.

24  Q    And, sir, are you aware whether or not a

25  transcript was prepared on the -- those words that are

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   intelligible on the recording equipment?

2   A    Yes.  Transcripts are also prepared.

3   Q    For the most part, is the spoken words between

4   you and Mr. Martin and the confidential informant

5   audible and able to be transcribed?

6   A    Yes, they were.

7   Q    Who was it who transcribed that particular video

8   recording, if you know?

9   A    I transcribed it.

10      MR. O'BRIEN:  May I approach the witness, Your

11  Honor?

12      THE COURT:  Yes.

13      MR. O'BRIEN:  I believe the exhibits are up on the

14  bench.

15  BY MR. O'BRIEN:

16  Q    Agent Jury, on the rail in front of you are two

17  items, one marked Government's Exhibit Number 5 and

18  Government's Exhibits number 5A.

19      Would you identify each of those in turn and tell

20  us whether or not you recognize them?

21  A    Exhibit 5 is a copy of the original recording

22  that was conducted on March 12, 2010 at the meeting

23  with myself, confidential informant and Demondre

24  Martin.

25  Q    Did you have a chance to compare that to the

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   original recording that was made?

2   A    Yes, I did.

3   Q    Is it accurate in terms of what you can hear and

4   see on that video recording?

5   A    Yes, it is.

6   Q    5A.  What is that item?

7   A    5A is a transcribed copy of what occurred on

8   March 12, 2010.

9   Q    Is that the transcript that you indicated you

10  prepared a few moments ago?

11  A    Yes, it is.

12  Q    The voices on the -- on the video recording you

13  recognize as yours and Mr. Martin's.  Is that true?

14  A    Yes, I would.

15  Q    Did you have a chance to speak with Mr. Martin

16  again following the meeting -- well let me ask you

17  this.

18       After you had discussed the details of the home

19  invasion at some point the conversation between you and

20  Mr. Martin ended.  Is that correct?

21  A    Yes, it is.

22  Q    Did you leave together, separately or how did the

23  meeting conclude?

24  A    He exited the undercover vehicle, returned to his

25  black 2007 Ford Edge he arrived in and departed the

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  location.

2  Q    Some days later, did you have -- excuse me, have

3  a chance to talk to Mr. Martin again?

4  A    Yes, I did.

5  Q    If I might direct your attention to the 22nd of

6  March 2010.

7        Do you recall that date in speaking to Mr. Martin?

8  A    Yes, I do.

9  Q    Do you recall whether or not the conversation on

10  the 22nd of March was initiated by you or Mr. Martin?

11  A    I received a telephone call from Mr. Martin.

12  Q    What was the nature of that telephone

13  conversation, if you remember, in terms of subject

14  matter or content?

15  A    Mr. Martin was questioning -- he was advising he

16  would like more details on the proposed home invasion.

17        And would like to meet -- arrange a meeting for me

18  to meet one or multiple members of his home invasion crew

19  to discuss the details.

20  Q    Had the call from Mr. Martin to you on the 22nd

21  of March been preplanned?

22  A    No, it was not.

23  Q    Were there any -- was there any recording

24  equipment set up at the time Mr. Martin called you on

25  the 22nd of March?

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   A    No.  Due to the timing of the telephone call, I

2   was not able to record it.

3   Q    Could you tell us, if you would, sir, how was it

4   Mr. Martin came to have your telephone number, if you

5   know?

6   A    On March 12, 2010, we exchanged telephone numbers

7   at the conclusion of the meeting, our original

8   meeting.

9   Q    You said there was a plan to meet with Mr.

10  Martin.  Is that correct, sir?

11  A    Yes.  On the March 22, 2010 telephone

12  conversation, we discussed meeting on March 25, 2010.

13  Q    And did that meeting come to take place?

14  A    Yes, it did.

15      MS. MANNERINO:  I'm sorry, Judge.  If I could

16  interrupt for a moment.  My client informs me he's very

17  uncomfortable.  He needs a break.

18      THE COURT:  Do we have permission to continue the

19  proceeding?

20      MS. MANNERINO:  I believe so.  He's indicated that

21  he would be fine with that.  I don't know if the

22  Marshals are comfortable with that.

23      THE COURT:  Are the Marshals able to accommodate

24  this defendant by escorting him downstairs and giving

25  him a break?

Usa v Martin, et al 10-20346

                Richard Jury-Direct Examination/Mr. O'Brien
                              12-13-2010

 1       Why don't you call another marshal to come up and

 2   escort him downstairs.

 3       MS. MANNERINO:  Thank you, Judge.

 4       THE COURT:  All right.  Soon as somebody comes up.

 5       MR. O'BRIEN:  May I proceed?

 6       THE COURT:  Jerry, can you call another marshal to

 7   come up?  Go ahead.

 8       MR. O'BRIEN:  Thank you.

 9   BY MR. O'BRIEN:

10   Q    The meeting on March 25th was set up; is that

11   correct, sir?

12   A    Yes, it was.

13   Q    Where was --

14       THE COURT:  Did you say March 26th?

15       MR. O'BRIEN:  March 25th.

16   BY MR. O'BRIEN:

17   Q    And where was that meeting to take place?

18   A    3641 Grand River in Detroit, Michigan.

19   Q    Is that the same cafe you spoke about a few

20   moments ago?

21   A    Yes, it was.  The meeting took place inside the

22   actual business.

23   Q    And at the time of that meeting, who from law

24   enforcement, other than yourself, was present?

25       Perhaps I'm a presuming you were there.

                    Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   A     Yes, I was.

2   Q     Anybody else besides you from law enforcement

3   there that you were aware of?

4   A     We had a surveillance team in the area conducting

5   surveillance on the location.

6   Q     Was there anybody with you seated inside the

7   restaurant or anybody who appeared to be associated

8   with you at that time?

9   A     No, there was not.

10  Q     At some point, did Mr. Martin arrive?

11  A     Yes, he did.

12  Q     When he arrived at that location, was he alone or

13  accompanied by somebody else?

14  A     He was accompanied with an unknown individual.

15  Q     Did you recognize the name Orvis Winans, sir?

16  A     Yes, I do.

17  Q     At some point, did you believe the individual to

18  be an individual by the name of Orvis Winans?

19  A     At one point we believed Orvis Winans was the

20  unknown individual that had shown up on that day.

21  Q     After that meeting on March 25th, were you able

22  to confirm whether or not the individual with Mr.

23  Martin was or was not Mr. Winans?

24  A     Yes, we were able to confirm he was not Orvis

25  Winans.

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  Q    As you sit here today, have you been able to

2  confirm the identity of the individual with Mr. Martin

3  on that day?

4  A    No, I was not.

5  Q    He is not somebody who works with law

6  enforcement?

7  A    No, not to my knowledge.

8  Q    And not an informant, to your knowledge?

9  A    No.

10  Q    During your conversation with Mr. Martin and this

11  other individual on March 25th, what was the subject

12  matter of that conversation?

13  A    We discussed details of the potential armed home

14  invasion and how Demondre Martin and the other unknown

15  individual would conduct the home invasion when it

16  occurred.

17  Q    During the course of your conversation -- and let

18  me ask you this if I can.

19        About how long did the three of you speak?

20  A    Approximately, an hour.  55 minutes to an hour.

21  Q    During the course of that conversation, again,

22  was there any discussion between you and Mr. Martin

23  and the person with him, about whether or not they had

24  any experience or familiarity with conducting home

25  invasions of drug homes, drug houses?

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    A     Yes, there was.

2    Q     Did one or both -- well, I'll take them in turn.

3          Did Mr. Martin indicate to you whether or not he

4    had any experience in that arena?

5    A     Yes.  He advised he was more than capable of

6    conducting and assisting in a home invasion.

7    Q     How about this other individual?

8    A     Yes, he did as well.

9    Q     During the course of your conversation with these

10   two men, was there any discussion with them about

11   whether or not you would be armed or whether or not

12   any firearms would be present in connection with this

13   home invasion?

14   A     Yes.  We discussed the ability that -- the

15   possibility that there would be firearms as well as

16   stating I had seen firearms previously at the

17   location.

18   Q     How did the two men you were speaking to respond

19   to that?

20   A     They discussed the possibility of disarming or a

21   fight ensuing during the home invasion.

22         THE COURT:  I'm sorry.  What conversation?  What

23   meeting was this?

24         THE WITNESS:  This was the in -- the meeting on

25   March 25, 2010 as well as that was also discussed on

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  March 12, 2010 of the firearm being located.

2      THE COURT:  When you say "they."  This other

3  unknown individual wasn't at that meeting on March 12?

4      THE WITNESS:  No, he was not.

5      THE COURT:  Who is "they"?

6      THE WITNESS:  On March 12, 2010, I discussed a

7  firearm -- I witnessed a firearm previously at the

8  narcotics stash house being present in the location to

9  Defendant Martin.

10      And on March 25th --

11      THE COURT:  Did Mr. Martin say anything on

12  March 12th about guns?

13      THE WITNESS:  Yes, he did.

14      THE COURT:  What did he say?

15      THE WITNESS:  He advised that he believed there

16  would be what he referred to as gun smoke during the

17  armed home invasion.

18      And that the individuals located inside the

19  narcotics stash house were there to protect the

20  narcotics and they would not allow them to leave without

21  attempting to protect the narcotics.

22      THE COURT:  Did Mr. Martin indicate to you in any

23  way that he believed that he and his people who were

24  going to carry out the home invasion, would have to have

25  guns?

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    THE WITNESS:  He advised that on March 25, 2010,

2    Demondre Martin, as well as the other unknown

3    individual, discussed possibly having to shoot, pistol

4    whip or, or kill individuals that resisted during our

5    home invasion.

6         THE COURT:  Are they coming up?

7         THE MARSHAL:  Yes, sir.

8         THE COURT:  Okay.

9         (Whereupon Defendant Davis left the courtroom)

10        THE COURT:  Go ahead.

11        MR. O'BRIEN:  Thank you, Judge.

12   BY MR. O'BRIEN:

13   Q    Agent Jury, when you first met with Mr. Martin

14   and this other individual on the 25th, was there any

15   discussion between the three of you about whether or

16   not this third person had been provided any

17   information by Mr. Martin or given any background on

18   your meeting with him?  "He" being Mr. Martin on the

19   12th?

20   A    When he -- when Demondre Martin and the unknown

21   individual originally arrived at the location, I

22   questioned him if he had already discussed the

23   situation with the unknown individual.

24        And he advised he had.  And he proceeded to advise

25   that he had discussed firearms -- a firearm being in the

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   location as well as the quantity of kilograms that would

2   be present during -- at the stash location.

3        THE COURT:  How was this unknown individual

4   introduced to you?

5        THE WITNESS:  He arrived at the location with

6   Demondre Martin.

7        THE COURT:  How was he introduced to you?

8        THE WITNESS:  He was introduced to me by the street

9   name of B.

10       THE COURT:  Just B?

11       THE WITNESS:  Yes, sir.

12  BY MR. O'BRIEN:

13  Q    In your --

14       THE COURT:  You were playing a role as a -- in an

15  uncover capacity as a drug dealer, right?

16       THE WITNESS:  I had explained myself as a

17  trafficker for a larger scale drug operation.  Yes, sir.

18       I would transport the narcotics to locations that

19  they instructed me to transport them to.

20       THE COURT:  In that role, you would have been

21  concerned that maybe Mr. Martin was a government

22  informant, wouldn't you have?

23       THE WITNESS:  Yes.

24       THE COURT:  And maybe the person who he brought

25  with him would have maybe been a government informant?

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    THE WITNESS:  That would have been a possibility,

2  yes.

3    THE COURT:  Or an undercover officer?

4    THE WITNESS:  Absolutely.  Yes, sir.

5    THE COURT:  Did you ask Mr. Martin any questions

6  about that?

7    THE WITNESS:  I advised him at all times I was

8  nervous concerning the home invasion and stressed the

9  possibility I would be sought after following a home

10  invasion by the individuals I worked for.

11    THE COURT:  Okay.  Go ahead.

12  BY MR. O'BRIEN:

13  Q   Were their discussions between you and Mr. Martin

14  and this other individual about how any narcotics were

15  taken from the home would be divided?

16  A   Yes.

17    We came to the agreement during the conversation

18  that they advised there would be -- during the armed home

19  invasion, Demondre Martin, the unknown individuals as

20  well as another unknown individual, would split the

21  proceeds of the narcotics that were removed from the

22  location to -- we discussed initially five kilograms a

23  piece.

24  Q   In your conversation with --

25    THE COURT:  I'm sorry.

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1      Who would get the five kilograms a piece?

2      THE WITNESS:  If there was a total of 20 kilograms

3  five kilograms would go to each individual that took

4  place in the home invasion.

5      THE COURT:  What would your cut be?

6      THE WITNESS:  Five kilograms.

7      THE COURT:  So you would get five and each of the

8  people working with Mr. Martin and Mr. Martin would get

9  five?

10      THE WITNESS:  Yes, sir.

11  BY MR. O'BRIEN:

12  Q    In your conversation with Mr. Martin on the 12th,

13  did you have any understanding about whether or not he

14  would conduct the home invasion alone or bring other

15  people with him?

16  A    They discussed bringing a possible -- or they

17  discussed bringing a third individual with them during

18  the home invasion.

19  Q    Was that conversation on the 25th or 12th?

20  A    The 25th.

21  Q    It would have been those two and yet a third

22  individual?

23  A    Yes.

24  Q    During your conversation with these two men on

25  the 25th of March, did Mr. Martin provide you any

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   advice on or any ideas he had about the best way to

2   make the home invasion work, either in terms of

3   getting them in the home, getting you out of the home

4   or anything along those lines?

5   A    We discussed the possibility of entering through

6   the front door and restraining the individuals inside

7   the residence.

8        They, "they" being Demondre Martin and the other

9   unknown individual, had discussed utilizing the cell

10  phone to notify if it was possible to enter the house

11  through the front door.

12  Q    You or anybody from ATF take any steps to attempt

13  to record your meeting with Mr. Martin and this other

14  individual?

15  A    Yes, we did.

16  Q    What steps were taken in that regard?

17  A    I had an audio/video recording of the

18  conversation.

19       THE COURT:  This was on March 25th?

20       MR. O'BRIEN:  Yes, Your Honor.

21  BY MR. O'BRIEN:

22  Q    They -- the audio recording equipment, did it

23  function?

24  A    Yes, it did.

25  Q    Was there an audio recording, a video recording

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    made of that meeting?

2    A    Yes, there was.

3    Q    Did you have an opportunity to review it?

4    A    Yes, I did.

5    Q    Are the words or some percentage of the words

6    spoken between the three of you audible and

7    understandable?

8    A    Yes, they are.

9    Q    Was there a transcript that was created of that

10   meeting?

11   A    Yes, there was.

12   Q    And who was it who created that transcript?

13   A    I did.

14   Q    Did you create the transcript in connection with

15   listening to the audio or watching the video?

16   A    Yes, I did.

17   Q    Could you take a look at what has been marked as

18   Government's Exhibit 1 and 1A in front of you, sir,

19   and identify them?

20   A    Exhibit 1 is an audio/video -- a copy of the

21   audio/video recording that occurred on March 25, 2010.

22   Q    And what is 1A?

23   A    1A is the transcriptions of the recording from

24   March 25, 2010.

25   Q    And you recognize both of those as exact copies

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  of the original?

2  A    Yes, I do.

3  Q    On April 7, 2010, did you, again, have occasion

4  to speak to Mr. Martin?

5  A    I'm sorry.  Could you repeat that time.

6  Q    April 7, 2010, did you and Mr. Martin again

7  speak?

8  A    Yes, I did.

9  Q    Did you call him or did he call you?

10 A    I called him on that day.

11 Q    What was the nature of your conversation with him

12 on that day?

13 A    I advised him I was waiting on the telephone call

14 from the individual that I was working for.

15     He advised that he was waiting to hear back from me

16 and he was getting his guys together for the home

17 invasion.

18 Q    Was that telephone call recorded?

19 A    Yes, it was.

20 Q    Would you identify Government's 2 and 2A, if you

21 would, please.

22 A    Exhibit 2 is a recording of the telephone call on

23 April 7, 2010 with Demondre Martin and myself.

24 Q    And 2A?

25 A    2A is the transcription of that recording.

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  Q    Are you the person that created that transcript

2  as well?

3  A    I was.

4  Q    Do you know those to be the exact recordings of

5  the originals that you prepared?

6  A    Yes, they were.

7  Q    Did you have occasion to speak again to Mr.

8  Martin after April 7, 2010?

9  A    Yes, I did.

10 Q    And do you recall the date of that conversation?

11      THE COURT:  In the April 7th conversation, was

12 there any mention of firearms?

13      THE WITNESS:  We discussed -- during the

14 conversation, no, Your Honor.

15      We discussed during the conversation that Defendant

16 Martin as well as is the unknown individuals present at

17 the March 12, 2010 meeting are capable of doing licks or

18 home invasions.  They would have no trouble completing

19 the home invasion.

20 Q    When was the next time that you and Mr. Martin

21 spoke?

22 A    The May 25, 2010.

23 Q    That -- was that a call by you to Mr. Martin or

24 Mr. Martin to you?

25 A    That was a call by me to Mr. Martin.

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   Q    And what was the nature of that conversation?

2   A    I advised him that I had been contacted by the

3   individual I worked for and that the shipment of

4   multi-kilograms of cocaine was coming in two days.

5   Q    How did Mr. Martin respond to that?

6   A    Mr. Martin advised he would get a hold of his

7   guys to make sure that everybody would be on the same

8   page for the day of the shipment arriving.

9   Q    Did you and Mr. Martin, during that conversation,

10  plan or discuss a future meeting?

11  A    Yes.  We discussed meeting the day of the

12  shipment arriving, which would be May 27, 2010, prior

13  to the home invasion.

14       So everybody -- every member of his crew would get a

15  visual of my face and know who I was.

16            (Whereupon Defendant Davis then returned

17             to the courtroom)

18  BY MR. O'BRIEN:

19  Q    What information did you provide to Mr. Martin

20  about your interest in everybody being able to see

21  what you look like?

22  A    I advised that I wanted everybody on his crew to

23  know what I looked like so I would not be harmed

24  during the home invasion.

25  Q    Was there discussion between you and Mr. Martin

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   on the 25th of May whether or not Mr. Martin

2   anticipated any violence or any involvement of

3   firearms during the home invasion?

4   A    No, not on the 25th.  Not on May 25, 2010.

5   Q    When was the next time that you spoke with Mr.

6   Martin?  Let me ask you this.

7        At the conclusion of your conversation on the 25th,

8   what was the plan?

9   A    We discussed meeting the day of the shipment

10  arriving on May 27, 2010.

11       THE COURT:  Was there a recording made of the

12  May 25th conversation?

13       THE WITNESS:  Yes, sir.  There was.

14       MR. O'BRIEN:  Thank you, Judge.

15  BY MR. O'BRIEN:

16  Q    Would you look at the look at the next two

17  exhibits in front of you, please.

18       They're marked as Government's 3 and 3A.

19  A    Yes, sir.  They are.

20  Q    Identify three and 3A in turn, please?

21  A    Exhibit 3 is the telephone conversation on

22  May 25, 2010 with Demondre Martin and myself.

23  Q    That is just an audio recording; is that correct?

24  A    Yes, sir.  It is.

25  Q    3A is what?

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   A    3A is the transcription of that conversation.

2   Q    Were you the person that prepared that

3   conversation as well?

4   A    Yes, I did.

5   Q    Do you know both of those items to be duplicates

6   of the original audio/video transcript you prepared?

7   A    Yes, sir.

8   Q    When was the next time you spoke to Mr. Martin?

9   A    May 27, 2010.

10  Q    And on May 27, 2010, did Mr. Martin call you or

11  did you call him?

12  A    Mr. Martin called me.

13  Q    Do you recall what time of day that telephone

14  call was made?

15  A    Approximately, 12 p.m.

16  Q    Mr. Martin say why it was he was calling you

17  afternoon on the 27th of May?

18  A    Mr. Martin questioned if the home invasion was

19  still planned for that day.

20  Q    And how did you respond?

21  A    I advise him in the positive.

22  Q    What other topics were discussed between you and

23  he in the telephone conversation on the 27th?

24  A    Mr. Martin advised that he had two or three new

25  individuals I had not seen that he wanted me to take a

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    look at prior to the home invasion that would be

2    assisting in the home invasion.

3    Q    Did you and he make any plan about how you would

4    accomplish that; either be introduced to those people

5    or be able to see what they looked like?

6    A    Yes.  We would have a meet prior to, to

7    conducting the home invasion, so all members of his

8    crew could get a visual of my face and know who I was.

9    Q    Did you and he discuss where that meeting would

10   take place?

11   A    Not in that telephone conversation.  We did

12   discuss it be up in the Brightmoor area of Detroit.

13   Q    That section of the city?

14   A    Yes, sir.

15   Q    Was there any discussion between you and Mr.

16   Martin during that telephone call about the use of

17   cell phones or how you would stay in touch with each

18   other?

19   A    Yes, there was.

20   Q    What was the nature of that discussion?

21   A    Mr. Martin expressed concerns on his cellular

22   telephone being able to be tracked back from contact,

23   contact with my cellular telephone.

24   Q    Was -- were you and he still communicating using

25   the same telephone numbers you had exchanged during

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    one of your earlier meetings?

2    A     Yes, we were.

3    Q     And did you and he -- excuse me.

4          Did you record the conversation on the 27th of May

5    when he called you?

6    A     Yes, I did.

7    Q     Were there subsequent conversations throughout

8    the day between you and Mr. Martin?

9    A     Yes, there was.

10   Q     And were those conversations of any length or

11   were they brief in time?  Or tell us about those.

12   A     The later conversations were concerning Mr.

13   Martin meeting at a predetermined location in the city

14   to meet prior to the home invasion.

15   Q     So were they conversations about where are you,

16   what time are you going to arrive or were they content

17   based?  Were you discussing the event itself?

18   A     The majority of the recordings were concerning

19   where Mr. Martin was and discussing him waiting on his

20   members of his home invasion crew to arrive so he

21   could come meet me.

22   Q     Take a look at the exhibits in front of you

23   marked 4 and 4A.

24         Identify those two items, if you would.

25   A     Exhibit 4 and 4A are the actual undercover

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  meeting with Demondre Martin and his crew.(sic)

2  Q    So there was a time that you and Mr. Martin

3  ultimately met.  Is that correct?

4  A    Yes, there was.

5       THE COURT:  Are these video and audio or --

6       THE WITNESS:  Yes.  Video and audio, sir.

7  BY MR. O'BRIEN:

8  Q    Where did that meeting, excuse me, ultimately

9  take place?

10  A    It was on the northeast corner service drive of

11  96 and Telegraph in a strip mall parking lot.

12  Q    Did you arrive in separate vehicles or were you

13  already there and did they arrive?

14       How did that happen?

15  A    I arrived first.

16       And, approximately, 30, four minutes later, Demondre

17  Martin arrived with three additional members of

18  individuals in his vehicle.

19  Q    The three additional individuals that were with

20  Mr. Martin on that day, had you ever met with any of

21  those people before or did you recognize any of those

22  people?

23  A    No.  I had never seen any of those individuals

24  prior to that occasion.

25  Q    The individual that you had been introduced to at

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   the restaurant on March 25th there?

2   A    No, he was not.

3        THE COURT:  Were you with anybody?

4        THE WITNESS:  No, I was not.

5        THE COURT:  You weren't with the C.I?

6        THE WITNESS:  No, sir.

7   BY MR. O'BRIEN:

8   Q    Were there other members of the law enforcement

9   providing support not obvious to somebody who might

10  have been watching that meeting?

11  A    Yes, sir.

12       There were surveillance members in and around the

13  parking lot area.

14  Q    When Mr. Martin in his vehicle arrived, tell us

15  what happened then.

16  A    I made contact with Demondre Martin and expressed

17  the desire to speak with the other occupants of the

18  vehicle.

19  Q    How did you -- how was it you made contact with

20  Mr. Martin; in phone or in person face to face?

21  A    I exited my vehicle and approached his vehicle

22  and spoke with Demondre Martin.

23  Q    Was he inside or outside at that time?

24  A    He was getting out of his car as I was

25  approaching his vehicle.

                  Richard Jury-Direct Examination/Mr. O'Brien
                                 12-13-2010

1    Q    Did you and Mr. Martin discuss your interest in

2    meeting the other people with him?

3    A    Yes.  I expressed concerns on them not speaking

4    to them, due to the fact that I felt we needed to

5    discuss the details of the home invasion.

6    Q    How did he respond to that?

7    A    He advised that the individuals were spooked on

8    meeting a new person, but he was able to contact them

9    via cell phone.

10        And Demondre Patrick and Michael Davis exited the

11   vehicle.  And I made contact with them.

12   Q    So he called from where he was standing, just

13   back to the car he had driven in?

14   A    Yes, sir.

15        THE COURT:  Were they all in the same car?

16        THE WITNESS:  Yes, sir.

17   BY MR. O'BRIEN:

18   Q    Mr. Davis and Mr. Patrick, were you able to see

19   their face at that time, have a conversation with

20   them?

21   A    Yes, I was.

22   Q    Would you recognize them if you were to see them

23   in court?

24   A    Yes, I can.

25   Q    Are they in court today?

                        Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   A    Yes.

2   Q    Identify where they're seated and how they're

3   dressed.

4   A    Deaunte Patrick is the individual in the yellow

5   jumpsuit on the left side of the table facing me.

6        Michael Davis is the individual in the green

7   jumpsuit sitting at the defense table.

8   Q    You said there was a fourth individual who

9   remained in the car?

10  A    Yes, there was.

11  Q    When those -- when Mr. Davis and Mr. Patrick got

12  out of the car, did you have a conversation with them?

13  A    Yes, I did.

14  Q    What was the nature of that conversation?

15  A    We had initial discussions on if they would be

16  following me into the residence when I arrived to pick

17  up the shipment to conduct the home invasion.

18  Q    During the course of your conversation with those

19  two men, did you come to any conclusion about whether

20  or not they understood why they were there or did they

21  voice to you their knowledge of what the purpose of

22  this meeting was about?

23  A    Yes.  They advised that they didn't -- due to the

24  situation, they wanted to observe the situation and

25  make sure that nothing went poorly or put anybody in

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   jeopardy.

2        They advised that -- when I say "they," Michael

3   Davis advised that if he felt or they felt that something

4   bad would go wrong, they would wait and allow me to leave

5   the location and do it the next time a shipment came in.

6   Q   Mr. Davis and you discuss whether or not he had

7   any experience in what was planned for later that

8   evening?

9   A   Yes.  He said he advised that these were the

10  kinds of things they do when they know what they're

11  talking about.  They'd know if, if the home invasion

12  would go properly.

13  Q   How about conversations with Mr. Patrick?

14       What information, if any, did he provide you about

15  himself or whether or not he understood why they were

16  there?

17  A   Mr. Patrick had observed the conversation and had

18  showed disinterest in leaving the location when I

19  advised leaving the location to a separate meet

20  location.

21  Q   Tell us about that.

22       Why is it that -- was there some part of the plan

23  that you would all leave that location and go somewhere

24  else?

25  A   Yes.  We had had a location set aside to travel

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   to that we felt if any -- if any.

2        MR. MAGIDSON:  Objection, Your Honor.  He's talking

3   about we.

4        THE COURT:  Can you be more specific?

5        THE WITNESS:  I apologize, Your Honor.  ATF.

6        ATF had set aside a second area location to take

7   the individuals to, to travel to, that we felt would be

8   safer for the public if, if any, anything bad happened

9   during the take down or arrest of the individuals.

10  BY MR. O'BRIEN:

11  Q    Why was that a concern?

12       Why was that a concern about public safety or if

13  any arrest was going to be effectuated at that location,

14  why it might be dangerous?

15  A    Due to the fact there we believed there might be

16  multiple firearms in the car, that these individuals

17  would be conducting a armed home invasion on a

18  narcotics stash house, that we had concerns of them

19  attempting to utilize the firearms when they were to

20  be arrested.

21  Q    During the course of your conversations with the

22  three people who had gotten out of the car, did you --

23  was there any discussion between you and anybody in

24  particular or the group about firearms being involved?

25  A    Yes.  I advised -- I discussed concerns with

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1   Demondre Martin, Deaunte Patrick and Michael Davis

2   about staying in the parking lot location when they

3   were strapped up or had firearms on their persons.

4   Q    And did they deny that they were in possession of

5   any firearms or did they indicate to you that that was

6   something you shouldn't be worried about?

7   A    Michael Davis said at a later -- several minutes

8   following that conversation, that they were not --

9   that they were not dirty.

10       But no discussions of firearms were discussed.

11  Q    What do you understand "dirty" to mean?

12  A    When an individual says that "they're dirty" or

13  "they're riding dirty", it might mean they have

14  something illegal on their person.

15  Q    There's this fourth individual in the car.

16       Did you ever have any conversation with that person

17  at all or did that person remain in the car the entire

18  time?

19  A    Yes.  He exited the vehicle and approached one of

20  the other members to borrow a cellular telephone when

21  I spoke with him.

22  Q    And who was that individual?

23  A    Elrico Welch.

24  Q    And would you recognize Mr. Welch if you ever saw

25  him again?

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  A    Yes.  He's the individual sitting on the corner

2  here in the plaid shirt.

3  Q    What conversation did you have with Mr. Welch, if

4  any?

5  A    I questioned if he was okay with the situation.

6       And he advised that he was, he was okay.

7       Those were his people.  He was up with whatever they

8  were okay with.

9  Q    During the course of your conversation with

10 Mr. Welch --

11      THE COURT:  You said he was up with it. Okay,

12 meaning he agreed to it?

13      THE WITNESS:  He agreed to it.  Yes, Your Honor.

14 BY MR. O'BRIEN:

15 Q    Was he otherwise talking to anybody else or was

16 he using the cell phone?

17 A    He was speaking on his cell phone.

18      Following that interaction, he walked away and was

19 speaking on his cell phone for the remainder of the

20 meeting.

21 Q    At some point while you're all in this parking

22 lot, what was the catalyst that was supposed to get

23 you out of there?

24 A    The, the main desire was to travel to a new

25 location that we felt was a safer arrest location.

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    But if that did not happen, I was to leave the area

2  and allow the arrest crew to arrest the individuals.

3  Q    And, ultimately, did it ultimately come to the

4  point where you left that area?

5  A    Yes, I discussed leaving the location.

6    And prior to leaving, they advised that they were

7  willing to travel with me.

8    THE COURT:  Travel with you in your car or?

9    THE WITNESS:  In their car.  They would follow me

10  to the secondary location.

11  BY MR. O'BRIEN:

12  Q    Did you leave the location at that point?

13  A    Yes, I did.

14  Q    And did they, in fact, follow you?

15  A    Yes.  They started to follow me, then turned off.

16  Q    Once they had turned off, did you take any action

17  to alert the other members of law enforcement who were

18  backing you up on that day?

19  A    Yes.  I contacted the on-scene commanders and

20  advised the individuals for whatever reason decided

21  not to follow me away.  And I believed there were

22  firearms in the vehicle.

23  Q    Once that information was provided to the

24  on-the-scene commanders, were you responsible for

25  trying to either detain that vehicle or get in contact

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

 1  again that evening?

 2  A     No, I was not.

 3  Q     Is that left to other members of the team who

 4  were conducting surveillance?

 5  A     Yes, it would be.

 6  Q     Were you responsible for, ultimately, the car

 7  being stopped or any search of that vehicle that was

 8  conducted?

 9  A     No, I was not.

10  Q     The information that you were discussing over the

11  past few moments --

12      THE COURT:  Let me ask you a question.

13      At the point that you left and then peeled off, had

14  you told any of them, Mr. Martin, Mr. Welch, any of

15  them, what the target house was or where it was?

16      Had you given them the address, for instance?

17      THE WITNESS:  No, sir.  We -- I did not supply an

18  address due to the fear that individuals might attempt

19  to rob the house prior to the location.  So I did not

20  supply it, an actual address to them.

21      I advised that it would be in the

22  Warrendale-Brightmoor area, which is on the west side of

23  the city.

24  BY MR. O'BRIEN:

25  Q     The vehicle that you were driving that day, was

Usa v Martin, et al 10-20346

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1  it outfitted with a recording equipment?

2  A    I had recording equipment on my person.

3  Q    Oh, okay.  So you had either a camera or

4  microphone that you were wearing?

5  A    Yes, I did.

6  Q    Was it audio or video recording equipment?

7  A    It was both.

8  Q    And the audio/video recording equipment, that's

9  the equipment that created Exhibit 4?

10 A    Yes, it was.

11 Q    And, subsequently, 4A is the transcript you

12 prepared from that audio/video recording?

13 A    Yes, I did.

14     MR. O'BRIEN:  If I may have a minute, judge?

15     (A discussion was held off the record)

16 BY MR. O'BRIEN:

17 Q    At some point during this conversation in the

18 parking lot, did any of the people who came in Mr.

19 Martin's car leave that area?

20 A    Yes, they did.

21 Q    Where did they go?

22 A    Michael Davis and Deaunte Patrick went into a

23 liquor/wine store that was located in the strip mall

24 of the parking lot.

25 Q    How long were they gone, if you know?

Richard Jury-Direct Examination/Mr. O'Brien
12-13-2010

1    A    Approximately, five minutes.

2    Q    When they returned from that liquor store, did

3    they have anything with them?

4    A    Michael Davis was carrying a blue plastic bag.

5    Q    Did it appear they had purchased something inside

6    that liquor store?

7    A    Yes, they did.

8    Q    They didn't show you what they had bought?

9    A    No, sir.

10        MR. O'BRIEN:  I don't have any other questions

11   Thank you, Judge.

12        THE COURT:  This was the store in the strip mall --

13        MR. O'BRIEN:  I'm sorry?

14        THE COURT:  -- at 96 and Telegraph?

15        THE WITNESS:  Yes, Your Honor.

16        MR. O'BRIEN:  I think Agent Jury has identified

17   each of -- all of the exhibits 1-5, as well as 1A

18   through 5A.

19        I move for their admission.

20        THE COURT:  Any objection to admitting the

21   exhibits?

22        MR. MAGIDSON:  No objection.

23        THE COURT:  Have counsel had an opportunity to

24   review the tapes and compare the transcript to determine

25   whether the transcripts accurately reflect the tapes?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    MR. MAGIDSON:  We've been provided all that.  I've

2   satisfied myself that it seems the ones that I have not

3   done word for word, but I satisfied myself, there

4   doesn't seem to be any major discrepancy.

5    I've discussed this with Mr. Martin as well.

6    THE COURT:  Okay.  All right.  Cross examination,

7   Mr. Magidson.

8                    CROSS EXAMINATION

9   BY MR. MAGIDSON:

10  Q    Good afternoon, Agent Jury.  My name is Mark

11  Magidson.  I represent Mr. Martin.

12    I'm just going to ask you a few questions this

13  afternoon, follow up on what you've stated.

14    If there's anything you don't understand, ask me to

15  repeat it.  Fair enough?

16  A    Yes, sir.

17  Q    I'm going to kind to want to focus back onto that

18  night, late afternoon.

19    Was it May 27th that was the -- that was the day of

20  the purported home invasion.  Is that correct?

21  A    Yes, sir.

22  Q    All right.  And you got their first.  Is that

23  correct?

24  A    Yes, I did.

25  Q    And then Mr. Martin was late.  Is that correct?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1  A    Yes, he was.

2  Q    You had to call him a number of times saying

3  where are you?

4  A    Yes, sir.

5  Q    This was the big deal.  He's not showing up, so

6  you're concerned.  Is that correct?

7  A    Yes, sir.

8  Q    Now you said when he finally got there, you

9  approached his vehicle?

10  A    Yes, I did.

11  Q    Did you get a chance to look in the vehicle?

12  A    No, I did not.

13  Q    So you had no ability to observe whether there

14  was any contraband of any nature in the vehicle.

15  Correct?

16  A    No.  The only, only items I saw in the vehicle

17  looked like there was clothing in the backseat of the

18  vehicle.

19      THE COURT:  Was he driving the same car, the Ford

20  Edge, as he had been driving?

21      THE WITNESS:  No, Your Honor.  He drove a separate

22  car on the March 25, 2010 meeting in which was a

23  four-door red Malibu which he arrived in on the

24  May 27, 2010 incident.

25

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   BY MR. MAGIDSON:

2   Q     Incidentally, did you ever check to see who that

3   vehicle was titled to?

4   A     My co-case agent would have ran that.

5         I believe -- I don't want to speak out of turn, but

6   I believe it was Ms. Burton that it was titled to.

7   Q     So it wasn't his vehicle, correct?

8   A     No, it was not.

9   Q     He was driving it, however.  Correct?

10  A     Yes, he was.

11  Q     It was titled to some other individuals' name.

12  Is that correct?

13  A     Yes, sir.

14  Q     When you first were approached by your

15  confidential informant, he gave you two names,

16  Mr. Pope and Mr. Martin?

17  A     He gave their street names, which would be -- for

18  Mr. Pope would be Tony and for Mr. Martin would be

19  Drè.

20  Q     Through your investigation, you were able to

21  deduce who those individuals were?

22  A     Yes, sir.

23  Q     I assume you were able to indicate you got state

24  I.D. or a driver's license?

25  A     Yes, sir.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   Q    You were able to do a criminal history check?

2   A    Yes, I was.

3   Q    You found out that Mr. Martin did have a criminal

4   history.  Is that correct?

5   A    Yes, I did.

6   Q    But it's true, none of his criminal history

7   involved armed robberies, home invasions, things like

8   that.  Correct?

9   A    No, it did not.

10  Q    Now --

11       THE COURT:  Did it involve firearms?

12       THE WITNESS:  No, it did not.

13  BY MR. MAGIDSON:

14  Q    Now the --

15       THE WITNESS:  To my knowledge, Your Honor, I'm

16  not -- his convictions I have not fully gone over what

17  the original charges were.

18  BY MR. MAGIDSON:

19  Q    Nothing stands out where he was convicted of

20  felony firearm or something or felon in possession or

21  anything of that or anything involving a weapon?

22  A    No, sir.

23  Q    One of his convictions was drugs.  Is that

24  correct?

25  A    Yes, sir.  At that present time, it was a pending

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   charge.  It was not a conviction.

2   Q    I understand.

3        Now the -- you've had -- you had multiple meetings

4   with Mr. Martin.  Is that correct?

5   A    Yes.

6   Q    Did -- you're an experienced agent.

7        You've had training and so forth on weapons.

8        Is that correct?

9   A    Yes, sir.

10  Q    Did you ever see a firearm on Mr. Martin?

11  A    No, sir.

12  Q    Sometimes you could see a bulge in his hip or

13  pocket or something.  Even though you don't actually

14  see it, it appears to be a weapon.

15       Did you note that?

16  A    No, sir.

17  Q    When you were having these meetings with him, you

18  discussed the fact that at some point it came up that

19  the so-called stash house, this make-believe stash

20  house, there was people in there guarding it.

21  Correct?

22  A    Yes, sir.

23  Q    And that they were armed with various weapons.

24  Correct?

25  A    Yes.  I advised there was an individual I had

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    seen in the past on all, all the separate occasions

2    that I traveled to the house with a shotgun.

3    Q    Right.  The Mexican with the shotgun?

4    A    Yes.

5    Q    All right.  He sits on the couch?

6    A    Yes.

7    Q    You don't -- so did you ever discuss -- Mr.

8    Martin ever discuss with you, well, I guess in order

9    for us to combat that shotgun, we're going to need our

10   own sawed-off shotguns; 12-gauge, 16 gauge.

11        Any of that discussion held?

12   A    On the March -- during the March 12th as well

13   these March 25th meetings, he did discuss having to

14   deal with that individual with the shotgun, yes.

15   Q    I understand.

16        But was there any specific firearms mentioned?  I

17   guess I'm going to need this type of a weapon or

18   automatic, semi-automatic, machine gun, whatever, AK's.

19   Anything like that?

20   A    No, sir.

21   Q    All general conversation; is that right, sir?

22   A    Conversation on March 25, 2010, Demondre Martin,

23   as well as the unknown individual, did discuss having

24   to -- in effect, if the individual did not give up his

25   firearm, shoot the individual.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1          But as far as firearms, discussing firearms, no.

2    Q    Talked in general, nothing specific?

3    A    No, sir.

4    Q    I'm going to shoot him with my 45.  I'm going to

5    use my AK.  I'm going to have my M-16.

6          Nothing like that?

7    A    No, sir.

8    Q    Never mentioned he had a specific gun, did he?

9    A    No, he did not.

10   Q    Going back to the 27th.

11         You're in a parking lot there and you are saying,

12   well, this is a, you know, we're out here in the open.

13   And you guys are all strapped on or something like that.

14   Right?

15   A    Yes.

16   Q    Moments later, one of the individuals says no, we

17   ain't dirty.  Correct?

18   A    Yes.

19   Q    As you've indicated that is the, I guess the

20   vernacular to say no or we don't have guns.  Correct?

21   A    That could be -- discussing what was presently on

22   them, someone's person, yes.

23   Q    Okay.  Now just going back a little bit on this.

24   This -- you were initially contacted by your

25   confidential informant, Mr. CI-85.  His name's Ortho?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   A     Yes, I was.

2   Q     He's on your payroll, correct?

3         When I say "your," I don't mean yours personally.

4         He's paid.  He's a paid informant?

5   A     He's paid a subsistence for assisting the

6   government.  Correct.

7   Q     He's been paid on this case?

8   A     Yes, he has.

9   Q     Do you know how much he's been paid?

10  A     I don't know that off the top of my head, no.

11  Q     Do you oversee his vouchers?

12  A     Yes, I do.

13  Q     Do you know how much -- how much he's submitted

14  to you?

15  A     I'm sorry?

16  Q     What was -- do you know how many hours he's put

17  in?

18  A     He doesn't get to put in paid for hours,

19  counselor.

20        It's based off actions that had been done for the

21  government as well as time and information provided.

22  Q     Okay.

23  A     And, no, I do not know what the total amount was.

24  Q     All right.  It appears he's been paid around

25  $6,000.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    Would that be higher or lower; do you have any

2  idea?

3  A    I would -- I would not know for this particular

4  case how much he was paid, sir.

5  Q    He has a rather lengthy criminal history himself;

6  isn't that right?

7  A    No.  I don't believe that that would be correct,

8  in my opinion.

9  Q    Well, he did have resisting and obstruction of an

10  officer out of Dearborn 1994, did he not?

11  A    I don't know his complete criminal history

12  offhand, counselor.  I'd have to review it.

13  Q    That's not a concern of yours?

14  A    Absolutely it is a concern, yes.

15  Q    Okay.  Would you know if he was found guilty of a

16  larceny from a person out of Dearborn in February of

17  1999?

18  A    I would have to review his criminal history.

19  Q    Okay.  How about -- do you know anything about

20  him being convicted of domestic violence out of

21  Dearborn in 1999?

22  A    I would have to review his criminal history,

23  counselor.  I can't speak offhand without looking at

24  his criminal history.

25  Q    Do you know if he had a drinking problem that --

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1  did he drink on the job with you?

2  A    No, he did not drink on the job with me.

3  Q    Did you know or were you aware of the -- that he

4  was found guilty of impaired driving out of Garden

5  City in July of 2000?

6  A    I can't say for sure what he was convicted of

7  offhand.

8  Q    And in 2004, did you know he was convicted of

9  possession of a dangerous device on July 7, 2004 out

10 of Dearborn, once again?

11      MR. O'BRIEN:  Your Honor, I think Agent Jury can't

12 answer.  Mr. Martin can go through every conviction.  He

13 doesn't know.

14      THE COURT:  Well, let's hear from Agent Jury.

15      MR. MAGIDSON:  He might know, judge.

16 BY MR. MAGIDSON:

17 Q    How about when he was convicted in Dearborn

18 Heights operating in violation of a restricted

19 license?

20      You don't know anything about that?

21 A    No, counsel.  I don't want to agree to a

22 particular charge.  I don't know the specifics of it

23 or years that you're stating.

24 Q    Finally, in 2007, apparently was found guilty of

25 uttering and publishing.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1          Were you aware of that?

2     A     Counsel, I can't speak a hundred percent to any,

3     anything you're reading right now without visibly

4     looking at his criminal history.

5     Q     Okay.  Appears to be another count of operating

6     while intoxicated out of Dearborn in -- looks like

7     2010 in April, April 21, 2010, right around the time

8     you were doing this.

9          Did you know that?

10    A     No, I did not, not without reviewing the criminal

11    history.

12    Q     Okay.  Now at any rate, he comes to you and says

13    that Tony is trying to find somebody to do a home

14    invasion.  Is that how it comes about?

15    A     He contacted me and advised that this individual

16    did advise him he was interested in doing a home

17    invasion of a narcotics stash house, yes.

18    Q     And you said, well, you know, explore it further

19    or, you know, find out what's going on.  Words to that

20    affect?

21    A     I advised him if he was, to keep in contact with

22    Mr. Pope to see if he was serious about conducting the

23    armed home invasion before we looked into it, yes.

24    Q     Rob gets paid by the job, by the amount of

25    information, correct?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1      He doesn't get paid by the hours?

2   A   I'm sorry?

3   Q   He doesn't get paid by the hour, he gets paid

4   by --

5   A   Yes.  For the work or information he provides.

6   Q   For the business he brings to you, more or less?

7   A   Yes.

8   Q   So he then goes back to Mr. Tony and has further

9   conversations; is that correct?

10   A   I advised if he came back in contact with

11   Mr. Pope, to contact me and let me know if there was

12   further conversation concerning a home invasion.

13   Q   At some point, Mr. Pope or some, somehow, the

14   confidential informant gets a hold of a number for

15   Mr. Martin; is that correct?

16   A   Yes, sir.

17   Q   And at that point, you advise him to contact,

18   make contact with Mr. Martin to see if they're

19   serious?

20   A   When he initially contacted me, he said that

21   there was an individual that Mr. Patrick wanted him to

22   contact to get ahold of.

23       And he, he advised he would contact Mr. Martin to

24   see if he was interested.

25   Q   Did he mention to you that he, in fact, he and

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    Mr. Martin, known as Drè I guess on the street, had a
2    meeting over at Honest John's Bar?
3         Did he mention that?
4    A    He advised that he met with him and in the
5    central area of Detroit.
6    Q    Do you know Honest John's Bar to be in the
7    central area of Detroit?
8    A    Honest John's is just outside of the downtown
9    area.
10   Q    So a little bit north of the downtown sort of
11   midtown area?
12   A    Yes.
13   Q    The C.I. was known as Rob is that correct?
14   A    Yes.
15   Q    And did he discuss with you, later, the general
16   contents of the conversation that he had with Mr.
17   Martin?
18   A    He -- yes, he did.
19   Q    And at least in one of the conversations -- do
20   you know if he had multiple conversations with him,
21   with Martin?
22   A    I believe that his initial contact was by phone
23   and they met in person.
24   Q    Right.  And was it true that you had told the
25   confidential informant basically what a plan would be?

Usa v Martin, et al 10-20346

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1       In other words, that plan's going to be to rob this

2  fictitious stash house, that you were going to be a

3  disgruntled courier for the big guys.  And they'd been

4  ripping you off, something like that?

5  A    Yeah.  I had advised that -- I advised the

6  informant that he knew possibly of an individual that

7  had a narcotics stash house that could be robbed.

8  Q    Right.  And, in fact, what Rob or CI-85 had told

9  Mr. Martin was that this, this stash house -- you had

10  a key for it and it was just -- all you had to do is

11  go in, grab the stuff and get out, basically.

12       Wasn't that the deal?

13  A    No, that was not the deal.

14  Q    Well, but there was something that you were upset

15  about with, with Rob.

16       Rob or CI-85 had told Mr. Martin; isn't that

17  correct?

18  A    Mr. Martin, when I spoke to him on -- it would be

19  April or disregard that, March 22nd, advised that the,

20  the information that Rob initially had given him was

21  slightly different.  But he was cool with the

22  information.

23       I apologize, Your Honor.  He was fine with the

24  information that I had provided for him on

25  March 12, 2010.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   Q    But you were kind of mad.  You pretended to be

2   kind of mad at Rob.  You were talking to Martin.

3        You said, quote:

4        I'm being straight with you after the shit

5        Rob pulled running his fucking mouth.

6        You were mad at him that he ran his mouth about a

7   different plan; isn't that right?

8   A    I was cutting -- I was cutting the informant out

9   of the meetings in furtherance of any further meetings

10  that we would have.

11  Q    Right.  Because you had found out what Mr. Martin

12  had told you is that, you know, that the initial plan

13  was that there was not -- this was an unguarded house

14  where, basically, he had -- all he had to do --

15  because these were houses where -- these big guys, the

16  big drug dealers, they knew realtors, they knew

17  abandon houses or empty houses.  They stashed their

18  drugs in an empty house.

19       You had the keys or somebody had the keys to these

20  houses?

21  A    I never provided any of that information to Mr.

22  Martin.  That was not the -- that was not what we

23  discussed on my initial meeting.

24  Q    I understand.

25       But what he conveyed to you -- that's what Rob,

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    your confidential informant, had told him?

2    A    Mr. Martin did not get into the entirety of what

3    was discussed between the informant and himself.

4    Q    But he told you enough to know that there was

5    no -- there was not going to be any gun play.

6         There was no armed -- initially, at the very

7    beginning, there was going to be no guards at this

8    place.

9         This was just stacks of bricks sitting in a drug

10   house.  That it was not guarded.

11   A    He discussed with me that it was the situation

12   that I explained was more serious then what he

13   initially had heard from the informant.

14   Q    What he initially heard from the informant was

15   that this was an empty house full of drugs and he had

16   a key to go in.

17        And you said, no.  Rob had it wrong.  You were mad

18   at Rob?

19   A    I explained to him based off the first

20   conversation I had with him on March 12, 2010, as far

21   as a further meetings, what the actual situation was.

22   Anything that was told him by the informant would be

23   inaccurate.

24   Q    Right.  This was after he had met with you,

25   correct?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    A    I'm sorry?

2    Q    Now's he's meeting with you?

3    A    Yeah.  March 12, 2010, yes.

4    Q    Right.  So Rob had initially told him something.

5         And then the next step is the meeting with you,

6    correct?

7    A    Yes.

8    Q    All right.  So whatever Rob had told him

9    convinced him to meet with you, correct?

10   A    Whatever -- the discussion, the initial

11   discussion of home invasion is what led to our

12   meeting, yes.

13   Q    Okay.  That was March 12th?

14   A    Yes, it was.

15   Q    And he discusses -- then you discuss, well,

16   there's this, this Mexican with a shotgun.  There's

17   these other guys that might be armed.

18        This is where it comes up; is that correct?

19   A    Initial meeting with Martin, yes, is what we

20   discussed.  The home invasion, yes.

21   Q    Then he says at one occasion there he says, well,

22   there might have to be some shooting.

23        He only mentions it once, correct?

24   A    I'd have to review the transcripts, but I know it

25   was discussed at least once --

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1    Q    Okay.

2    A    -- during that first meeting.

3    Q    All right.  Now the second meeting where somebody

4    who is not Winans shows up.  Correct?

5    A    Yes.

6    Q    And isn't it true that the person who was not

7    Winans, but you thought was Winans basically is

8    conducting the interview of you.  Correct?

9    A    (No response)

10   Q    He's trying to determine what the plan is.

11   A    He -- this individual is known as Demondre Martin

12   was discussing the plans.

13   Q    You started all over again.

14        You have to explain everything.  It's like he never

15   heard it before from Martin.

16   A    No.  That's inaccurate.

17        During the initial meeting, Demondre Martin explains

18   to me he already discussed it with him.

19        He mentions multiple things, including the

20   individual with the shotgun in the residence as well as

21   the quantities of kilograms of cocaine that would be

22   present at the location.

23   Q    And Mr. Martin at some point concludes, referring

24   to the -- referring to the person you believe to be

25   Winans, this guy knows his stuff.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1       He's referring to him.  This is Winans.  He knows

2    what he's doing.  Right?

3    A    Winans was never used.  He did advise that that

4    individual -- that's what he does for a living.

5    Q    That's what he does.  Right.  Okay.

6       But he's not at the -- now is the big day, the day

7    of the home invasion.

8       Mr. Big is about to call you and the delivery's

9    about to be made.

10      And here Mr -- not Winans, is not present in the

11   car.  Correct?

12   A    That's correct.

13   Q    In fact, didn't that seem a little unusual for

14   you?  This is one of the main guys, now he's not

15   there?

16   A    The telephone conversation I had earlier in the

17   day, he discussed bringing three new individuals as

18   well as what their plans were to do during the home

19   invasion.

20   Q    So you're at that location and you're trying to

21   get them to go to this garage area where the arrest

22   would be able more easier to be accommodated.

23      And you finally talk them into going; is that

24   correct?

25   A    I believe I had, yes.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   Q    And then you depart the parking lot.

2        And now as you said this is on the corner of the

3   service drive and Telegraph and service drive of 96?

4   A    Yes.  That's correct, northeast corner.

5   Q    Northeast corner.  So you would be heading -- you

6   pull out of the parking lot.

7        I guess there's only one you can travel.  Because

8   isn't it true that at that point you exit on to

9   Telegraph, correct?

10  A    Yes.

11  Q    And Telegraph is -- that's under the -- near

12  where the overpass is or underpass is?

13  A    Yes.  That's correct.

14  Q    You can only pull out of it one way?

15  A    Yes, sir.

16  Q    You'd have to travel in a northerly direction?

17  A    No.  You can exit out of the south side of the

18  parking lot to go west on the service drive.

19  Q    If you're going to exit out on to Telegraph, you

20  can only go north at that location?

21  A    If you were to go northbound on Telegraph, yes,

22  that's the only way you could go.

23  Q    Right.  And so you had you head north?

24       THE COURT:  I'm sorry.  You head what?

25       MR. MAGIDSON:  Ha?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1        THE COURT:  I didn't hear you.

2    BY MR. MAGIDSON:

3    Q    You turned north on to Telegraph?

4    A    Yes, I turned north on Telegraph.

5    Q    And you continue on headed, I guess toward Five

6    Mile or Fenkell, whatever it is?

7    A    I pulled off a ways down.

8         And when I pulled out to see if they were following

9    me, that's when I observed them turning around.

10   Q    They had followed you initially, but at the first

11   opportunity they made one of these what they call a

12   Michigan turn.

13   A    Michigan turn.

14   Q    They get in the far left lane.  Then they were

15   going southbound?

16   A    Yes.  That's correct.

17   Q    You were still north of the location?

18   A    Yeah.  I was north of the location.

19   Q    Were you able to see them?

20   A    Spin around.

21   Q    When they turned around?

22   A    Yes, I did.

23   Q    Were you able to -- what time of day or evening

24   was this?

25   A    It was, approximately, 7:30.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1  Q    So it's light?

2  A    It was still -- during that time of year, it was

3  still light, yes.

4  Q    May.  So -- and you observed where the car goes.

5  When I say "the car" --

6  A    No.  I observed it go south, do the Michigan turn

7  around, go southbound.  And I lost sight of them.

8  Q    You later found out that they turned left, which

9  would be east on the onto the service drive, then

10 downtown 96 going east to Detroit?

11 A    Yes, I was instructed that they had conducted a

12 traffic stop on 96 itself.  Okay.

13       THE COURT:  Just so I'm clear.  This is 96, the

14 Jefferies?

15       MR. MAGIDSON:  The Jefferies?

16       THE WITNESS:  Yes, sir.

17       THE COURT:  So by this time they're east of

18 Telegraph on 96 and you're still on Telegraph headed

19 north?

20       THE WITNESS:  Yes.

21       THE COURT:  Where was your meet place going to be?

22       THE WITNESS:  We had gotten an undercover location,

23 Your Honor, at a north location off of the area of

24 Fenkell and Telegraph.

25       THE COURT:  So not very far.

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1        THE WITNESS:  No, sir.

2   BY MR. MAGIDSON:

3   Q     Roughly a mile down the road --

4   A     Yes.

5   Q     -- down Telegraph?  Okay.

6         And so they -- they were on 96.  Ultimately, they

7   were pulled over near -- Jefferies near Schaefer or --

8   A     I believe that's accurate.  I wasn't present

9   during the --

10  Q     Two miles down the road?

11  A     That's approximate.  Yes, sir.

12  Q     Okay.  And you then notified your -- some of the,

13  the other members of your team to stop them?

14  A     Yes, I did.

15  Q     You said to stop them because you believe they're

16  armed and dangerous or something like that?

17  A     I advised that I believed there were firearms

18  located inside the vehicle around the individual's

19  person.

20  Q     That belief was based upon not what you saw,

21  correct?

22  A     No.

23  Q     Or not what you were told, correct?

24  A     Prior -- earlier in the day at, approximately,

25  12:00 when I had spoken to Demondre Martin, he advised

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   that the individuals that would be coming out on the

2   home invasion did not let anybody live inside the

3   residence.

4       And they planned on smoking the individuals when

5   they were leaving the residence.

6       So based on that fact, I did believe there were

7   firearms in the vehicle, yes.

8   Q   Okay.  Well, but nobody simply said, you know,

9   we're at the meeting location right there.  You know,

10  we've got a 45.  We've got a 38.  We've got an AK?

11  A   No, no specific firearms were discussed, no.

12  Q   It was -- it was based upon your understanding of

13  your belief that there's firearms in the vehicle,

14  correct?

15  A   Yes.

16  Q   All right.  Did you have a warrant, an arrest

17  warrant at any point?

18  A   We completed arrest warrants upon taking the

19  individuals into custody, due to the fact we did not

20  know who was going to be showing up at the location.

21  Q   I guess my question was, was prior to the

22  stopping of this vehicle, was there -- did you issue

23  an arrest warrant?

24  A   No.

25  Q   You knew Mr. Martin was going to be there

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1  probably; is that right?

2  A    Yes, sir.

3  Q    In fact, he was there driving a vehicle that at

4  least wasn't titled to him, but he was driving a

5  vehicle, correct?

6  A    Yes.

7  Q    All right.

8      Did you get a search warrant for the vehicle once

9  these gentlemen were apprehended?

10  A    I don't believe a search warrant was produced,

11  no.

12  Q    And, ultimately, the vehicle was -- these

13  gentleman, as far as you know -- do you ever arrive on

14  the scene, sir?

15  A    No, I did not.

16      I was not present during any of the arrest take down

17  or search of the vehicle.

18  Q    But based on what you do know, the vehicle was

19  stopped by was it Michigan State Police?

20  A    Yes.  That's correct.

21  Q    And the -- all four people in the vehicle were

22  taken out of the vehicle.  Is that correct?

23  A    Yes.  That's correct.

24  Q    Would it be the custom and procedure that you

25  would immediately handcuff them?

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   A    I would believe in a position like that yes, it

2   would be.

3   Q    Then they would be placed into the various police

4   cars or what other --

5   A    Yes.  That's correct.

6   Q    -- agent's vehicles.  Is that correct?

7   A    Yes.

8   Q    And at that point the vehicle that Mr. Martin was

9   driving, was that taken into custody of the agents?

10  A    I wasn't present during the take down of that

11  vehicle, counselor.  I don't know what happened to the

12  vehicle.

13  Q    To the best of your knowledge, that vehicle

14  wasn't left on the side of the road?

15  A    I believe, due to it being on the expressway, it

16  was moved from that location, yes.

17  Q    While it was being moved and until it got to

18  another safe location, was there ever a search warrant

19  obtained at any point?

20  A    Not to my knowledge.

21       MR. MAGIDSON:  Your Honor, may I have just one

22  minute?

23       THE COURT:  Sure.

24            (After a short delay,

25            the proceedings continued)

Usa v Martin, et al 10-20346

Richard Jury-Cross Exam/Mr. Magidson 12-13-2010

1   BY MR. MAGIDSON:

2   Q    Now it's true that when you were departing that

3   parking lot and then you saw that Mr. Martin went the

4   other way, turned south, you called him?

5   A    Yes.

6   Q    Multiple times?

7   A    I attempted to contact him to see what he was

8   doing, where he was going.

9   Q    Never answered the phone?

10  A    No.

11  Q    Maybe called five, six times?

12  A    I don't believe it was that high.  I believe it

13  was two or three times.

14  Q    But he didn't pick up?

15  A    No, he did not.

16       MR. MAGIDSON:  Your Honor, will other counsel have

17  an opportunity to question?

18       THE COURT:  Limited.

19       MR. MAGIDSON:  I've nothing further at this time.

20       THE COURT:  Mr. Schulman?

21       MR. SCHULMAN:  Thank you.

22                CROSS EXAMINATION

23  BY MR. SCHULMAN:

24  Q    As relates to Mr. Patrick, your testimony was

25  prior to May 27th, you had no contact or information

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1    as relates to him?

2    A    No.

3    Q    That's correct?

4    A    Yes.  That's correct.  I apologize.

5    Q    Then on May 27th, that was your first contact

6    with Mr. Patrick?

7    A    Yes, sir.

8    Q    Who you've identify today?

9    A    Yes.

10   Q    And you testified that someone indicated we're

11   not dirty or I'm not dirty.  Words "not dirty".

12        Do you remember those words?

13   A    Yes.  Michael Davis, I believe, stated that.

14   Q    Are you sure that was Mr. Davis and not

15   Mr. Patrick?

16   A    I would have to review the transcription.

17   Q    You were videotaping this, correct?

18   A    Yes, sir.

19   Q    When you were videotaping, do you remember

20   Mr. Patrick was -- if you look at the video, he would

21   be all the way on the left?

22   A    I believe he was, yes.

23   Q    Isn't that where that "not dirty" phrase came

24   from, if you recall?

25   A    I would have to review the video and

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1  transcriptions, counsel.  I don't recall.

2  Q    Now as an experienced agent, on occasion, if you

3  were to say verify something, would you ask somebody

4  to say let me see the money.  Let me see the drugs.

5  Let me see the guns.

6       That's not unusual, is it?

7  A    That would be a possibility, yes.

8  Q    In fact, that's often done by agents to verify

9  things?

10 A    It depends on the situation.

11 Q    Okay.  Do you ever ask to verify firearms?

12      Say at that May 27th meeting in that parking lot

13 saying, I want to see you're not dirty.  Can I see some

14 firearms?  Anything like that?

15      Do you try to verify?

16 A    No.  Based -- during that conversation, I did

17 not -- I did not hear the individuals state that until

18 after I went back and reviewed the transcripts.

19 Q    Okay.  So these --

20      THE COURT:  Are you saying you didn't hear him say

21 it at the time?

22      THE WITNESS:  No.  Yes, sir.

23      I did not hear him state that at the present

24 location until I went back and reviewed the video.

25

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1   BY MR. SCHULMAN:

2   Q    And the location where you were ultimately to

3   bring the defendants, that was the suspected -- that

4   was the drug house, correct?

5   A    No.  That's not correct.

6   Q    That was the stop before the drug house?

7   A    We would take them to a separate location to try

8   to minimize any kind of potential violence towards

9   bystanders or citizens in the area.

10  Q    So we're clear.  It was actually not even getting

11  to the ultimate place.

12       You didn't even get to the place before the

13  ultimate place?

14  A    No.  We would never take them to an actual

15  location due to the fact that at that point we would

16  believe they'd be coming out of their vehicle with

17  firearms.

18  Q    But whatever reason, though, my point is, that

19  you never even got to the first --

20  A    No.

21  Q    -- you never even got to the first stop, right?

22       You never made it to the first place which wasn't

23  even supposed to be the --

24  A    The second -- we never made it to the secondary

25  location.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1  Q    And you indicated the reason for your contact

2  with what was ultimately the State Police who made the

3  stop was your concern for public safety.  Correct?

4  A    The decision to conduct the traffic stop on the

5  location was decided by my superiors as well as

6  on-the-scene commander.

7  Q    That was direct information from you?

8  A    Yes.  I advised I believed there was firearms in

9  the vehicle.

10 Q    Because they weren't there?

11 A    I'm sorry?

12 Q    Those supervisors weren't there.

13 A    No.

14 Q    They were relying on your --

15 A    My information.

16 Q    You indicated you saw no firearms.  Correct?

17 A    Yes.  No.

18 Q    You indicated you saw no narcotics?

19 A    No.

20 Q    And, in fact, they had no information of the

21 ultimately case.  Correct?

22 A    That is correct.

23 Q    Did they -- do you have any information that any

24 of the individuals, including Mr. Patrick, even knew

25 who these people would be in the car, in the house?

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1      Do you remember my question?

2   A   Can you --

3   Q   If I know- if I know that we're going to, say, to

4   meet Mr. Jones and I drive away in a different

5   direction, I still know who Mr. Jones is.

6      Do you understand in this case, did any of the

7   defendants know who the individuals were?

8   A   No, they did not.

9   Q   But not only did they not have the address or

10  location, you had no information they even knew

11  whether they were true or not actual people that were

12  supposed to be in the house?

13  A   That would be accurate, yes.

14     MR. SCHULMAN:  Nothing else.  Thank you.

15     THE COURT:  Mr. Tholen?

16     MR. THOLEN:  Yes, Your Honor.

17                  CROSS EXAMINATION

18  BY MR. THOLEN:

19  Q   Good afternoon, Agent Jury.

20  A   Good afternoon.

21  Q   With respect to Mr. Welch, it's true you had a

22  number of telephone conversations with Mr. Martin or

23  face to face meetings with Mr. Martin prior to

24  May 27th.  Correct?

25  A   Yes.  That's correct.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1   Q    And isn't it true that Mr. Welch was never

2   present during any of those telephone calls or any of

3   those physical face to face meetings that you had?

4   A    That's correct.

5   Q    Isn't it also true that Mr. Welch was never

6   mentioned by name as a person that was going to be

7   involved in as part of Mr. Martin's crew in this

8   robbery?

9   A    Until they showed up at the location, that would

10  be correct.

11  Q    Okay.  Turning your attention to May 27th.

12       That was the first time you met Mr. Elrico Welch?

13  A    Yes.  That's correct.

14  Q    He was one if the individuals that was in the

15  vehicle that Mr. Martin drove to your meet spot.

16  Correct?

17  A    Yes, he was.

18  Q    Mr. Martin was the driver -- I call him Mr.

19  Martin, the vehicle, the red car?

20  A    Yes.

21  Q    Mr. Welch was in the backseat, correct?

22  A    Yes, he was.

23  Q    Mr. Welch didn't drive the vehicle to that

24  location?

25  A    No, he did not.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1  Q    At that time on the 27th, you first had contact

2  with Mr. Martin, correct, in the parking lot?

3  A    I'm sorry.  Can you --

4  Q    You had -- when Mr. Martin's vehicle shows up at

5  the meet spot with you, you and Mr. Martin started

6  having a conversation about this plan that's going to

7  take place.  Correct?

8  A    Yes, that's correct.

9  Q    After sometime, two other individuals kind of

10  join in in that discussion, correct?

11  A    Yes.

12  Q    Mr. Welch was not one of those individuals,

13  correct?

14  A    No, he was not.

15  Q    And you testified that you have a video and audio

16  recording of your contact with each of these four

17  gentlemen on the 27th, correct?

18  A    Yes.  That's correct.

19  Q    And isn't it true that you also did a -- prepared

20  a transcript from your listening to the audio

21  recordings and watching the video recordings, correct?

22  A    That's correct.

23  Q    I think you testified -- is it Government's

24  Exhibits 4 and 4A?

25  A    Yes.  That would be correct.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1       MR. THOLEN:  Permission to approach, Your Honor?

2   BY MR. THOLEN:

3   Q    Agent Jury, you've reviewed Exhibit 4A, this

4   transcript, prior to testifying today.  Correct?

5   A    Yes, I have.

6   Q    You're pretty familiar with the contents of this

7   exhibit?

8   A    It's a decent size.  But, yes, I've got a general

9   idea of it, yes.

10  Q    Well, with respect to references to Mr. Welch,

11  it's rather a limited amount of information, correct?

12  A    As far as actually speaking to Mr. Welch, yes.

13  That would be correct.

14  Q    Well, agent, it's true, this exhibit is,

15  approximately, seven pages long.  Correct?  Take a

16  look at it if you want to.

17                  (After a short delay,

18                   the proceedings continued)

19  A    Yes.

20  Q    Okay.  Isn't it true that Mr. Welch or reference

21  to him does not appear except for the title caption

22  until the seventh page of that document?

23  A    I would have to go back through.

24  Q    Take your time.  I take that back, agent.

25       Isn't there notes to him -- it may be three or

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

 1  foyer pages in the middle of the page.

 2      There's a reference.  This is in italics and I

 3  quote:

 4      Welch exits the vehicle and approaches Davis.

 5      Is that correct?

 6  A    Yes.

 7  Q    Do you have that in front of you?

 8  A    Yes.  Here we go.

 9  Q    That's the first time that there is -- other than

10  in the title caption.

11      But that's the first time there's any reference to

12  Elrico Welch as far as that occurrence?

13  A    No.  On the second page, I questioned Demondre

14  Martin what was the deal with the other individual in

15  the vehicle.  And Mr. Martin advised he's cool.  He's

16  cool.

17  Q    It has no reference to Welch anywhere in that.

18  Correct?

19  A    I was referring to Welch when I was talking to

20  Mr. Martin.

21  Q    You may have been referring to that, but you --

22  it certainly doesn't indicate that anywhere in the

23  transcript.  Correct?

24  A    No, it does not.

25  Q    Where you do refer to Mr. Welch is your sole

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1    statement to him -- and I've drawn your attention to

2    that part half way down the page in italics:

3              Welch exits the vehicle and approaches.

4         The only comment that's made that you attribute

5    from your transcript by Mr. Welch is, quote:

6         Yeah, these my brothers.

7         Whatever they say, I'm on it.

8         Correct?

9    A    That's correct.

10   Q    Doesn't say I'm up, correct?

11   A    Says I'm on it.  I apologize for that, sir.

12   Similar expressions.

13   Q    Sure, agent.  But you indicated that you spent

14   some time on this investigation.

15        You reviewed the tapes and, in fact, did a

16   transcript.  Correct?

17   A    Yes, I did.

18   Q    Wouldn't you agree that accuracy is rather

19   important in this proceeding?

20   A    Absolutely, counselor.

21   Q    Don't you strive to be accurate --

22   A    Yes, I do.

23   Q    -- transcribing the information on video to

24   audiotapes?

25   A    Yes, I do.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1   Q    It's not -- it's not funny?

2   A    No.

3   Q    It's not funny at all?

4   A    No.

5   Q    There's no indication in that statement anything

6   about home invasion.  Correct?

7   A    No, there's not.

8   Q    There's no indication about any type of robbery.

9   Correct?

10  A    That's correct.

11  Q    There's no indication about drugs or narcotics.

12  Correct?

13  A    No.

14  Q    There's no indication about any firearms or

15  weapons.  Correct?

16  A    No.  That's correct.

17  Q    That is the sole interaction you had with

18  Mr. Welch on that occasion.  Correct?

19  A    That's correct.

20  Q    In fact, that's the only interaction you had with

21  Mr. Welch throughout your whole investigation of this

22  case.  Correct?

23  A    Correct.

24  Q    Shortly after that statements made, Mr. Welch --

25  after he gets a telephone from one of these gentlemen,

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1   walks away from where you're talking to Mr. Martin and

2   goes and makes a phone call.  Correct?

3   A    That's correct.

4   Q    And that's very obvious on the videotape because

5   all you see him do is walk away from where you and Mr.

6   Martin are.

7        And you see the back of his head as he's pacing

8   back and forth and talking on a cell phone.  Correct?

9   A    That's correct.

10  Q    He is not part of your discussion at that point.

11  Correct?

12  A    That's correct.

13  Q    And he wasn't part of the discussion before he

14  got out of the car and came up to get that cell phone.

15  Correct?

16  A    He would be part of the discussion.

17       As far as me discussing with these individuals, I

18  wanted everybody to see my face and know the situation.

19  Q    Agent, I understand you wanted him to be part of

20  the discussion.

21       But the only statement he made is what we just

22  talked about:

23       Yeah.  These are my brothers.  I'm up with

24       it, whatever.

25       Something to that effect.  Correct?

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1   A    That's correct.

2   Q    He didn't say anything more than that, correct?

3   A    That's correct.

4   Q    So there was no conversation between you and

5   Mr. Welch, correct?

6   A    That's correct.

7   Q    There's certainly no detailed discussion between

8   you and Mr. Welch.  Correct?

9   A    Just the few statements you mentioned.

10  Q    In fact -- no, no, not a few statements.

11       In fact, it's one line.  And I'll quote it again.

12  It's about eight words:

13       Yeah.  These my brothers.

14       Whatever they say, I'm on it.

15       Ten words.  Correct?

16  A    That's correct.

17  Q    That's the extent, the full 100 percent statement

18  that Mr. Welch made.  Correct?

19  A    That's correct.

20  Q    Nothing more?

21  A    No.  No, sir.

22  Q    Prior to him making that statement, he was not

23  part of any discussions between you Mr. Martin,

24  Mr. Patrick or Mr. Davis?

25       MR. O'BRIEN:  Asked and answered.  Objection.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1      THE COURT:  Overruled.

2      THE WITNESS:  I'm sorry.  Can you repeat the

3  question, please?

4  BY MR. THOLEN:

5  Q    Prior to the statement I just read, the ten word

6  statement, Mr. Welch was not part of the discussion

7  between yourself, Mr. Martin, Mr. Patrick and Mr.

8  Davis?

9  A    Not by name.  No, sir.

10 Q    He wasn't even physically there.  Correct?

11 A    I don't know if the discussions I had with Mr.

12 Martin were referring to him, counselor.

13     THE COURT:  Mr. Tholen --

14     MR. THOLEN:  I understand.  If I may, judge?

15     THE COURT:  -- I'm not sure that I need this to

16 make a decision on this particular motion.

17     MR. THOLEN:  Very well, Your Honor.

18     THE COURT:  It sounds more like trial cross

19 examination.

20     MR. THOLEN:  Let me -- give me the liberty for one

21 follow up question, judge?

22     THE COURT:  Go ahead.

23     MR. THOLEN:  Thank you.

24 BY MR. THOLEN:

25 Q    What's the total amount of time that you had some

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

 1  kind of discussion that Mr. Welch gave that ten word

 2  answer for?

 3       Are we talking 30 seconds, 10 seconds?  A minute?

 4  A    It might have been five, ten seconds, whatever it

 5  took for him to make that statement.

 6  Q    Agent Jury, you were asked the question by my

 7  brother counsel that didn't CI-85 receive

 8  approximately $6,000 from your office or the DOJ.

 9       Do you recall that question?

10  A    I do, yes.

11  Q    I think you answered it, that you weren't real

12  sure about the numbers; that that really wasn't part

13  of your responsibilities.  Wasn't that right?

14  A    I wouldn't say that.  I wouldn't say it wasn't

15  pat of my responsibilities.

16       I just wasn't -- off the top of my head, I could not

17  recall how much he was totally paid.

18  Q    Well, agent, isn't it true in situations where

19  confidential informants are being paid, that it's very

20  important that payments made to them are carefully

21  documented?

22  A    That's correct.

23  Q    And, in fact, your office at the Alcohol Tobacco

24  and Firearms, does that requires reporting an record

25  keeping of payments made to confidential informants?

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1    A    That's correct.

2    Q    And, in fact, weren't those types of records kept

3    in relation to CI-85?

4    A    Yes, they were.

5    Q    In fact, didn't you keep records and submit a six

6    month report of monies that were paid to CI-85?

7    A    Yes, I did.

8    Q    Didn't you submit a report or a memorandum dated

9    June 25, 2010, indicating that the cumulative amount

10   of money paid to this informant during the six month

11   period is $6366.

12       Does that sound correct?

13   A    It's a possibility.  I would have to review the

14   figures.  I did submit a list.

15   Q    Would it refresh your recollection to see this

16   memorandum?

17       THE COURT:  Where are we going with this?

18       MR. THOLEN:  I think it goes --

19       THE COURT:  I'm not particularly interested in --

20   for the purposes of this motion, I'm not particularly

21   interested in the CI-85, his statements, I can consider

22   them as part of the setting for the larger context.

23       But what I'm focused on is the conversations

24   between Agent Jury and the defendants here and whether

25   or not those conversations, themselves, provided a basis

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

1  for the stop.

2      Because anything that CI-85 told Agent Jury about

3  what they had said or what he told them is hearsay.

4      And even though I may consider it in the overall

5  context and his prior convictions and other things such

6  as this, which have already been brought out might go to

7  CI-85's credibility, the real issue here is what

8  probable cause did the agent in question here have to

9  conduct the stop on March -- on May 27th.

10     MR. THOLEN:  Understood, Your Honor.

11     Could I have one moment?

12     (A discussion was held off the record)

13     MR. SCHULMAN:  Your Honor, Mr. Patrick has asked to

14  use the bathroom.  I would waive his appearance.

15     THE COURT:  Well, I want to get this wound up.

16  This is taking far too long.

17     We've been going two hours with a witness that

18  probably should have been about 20 minutes for the

19  government and about half an hour all together for all

20  the defendants.

21     MR. THOLEN:  No further questions.

22     THE COURT:  We're getting pretty far afield.

23     MR. THOLEN:  No further questions.

24     MS. MANNERINO:  If I might?  I'll be brief.

25     THE COURT:  Good.  I was about to congratulate Mr.

Richard Jury-Cross Exam/Mr. Schulman 12-13-2010

 1   Tholen being the rare lawyer who says I have one more

 2   question the only asked one.  Then he continued.

 3                   CROSS EXAMINATION

 4   BY MS. MANNERINO:

 5   Q    All right.  Thank you.

 6        Good afternoon. I'm Maria Mannerino.  I represent

 7   Mr. Davis.

 8   A    Good afternoon.

 9   Q    So we're clear, before the 27th of May, you'd

10   never had any contact with Mr. Davis.  Right?

11   A    No, ma'am.

12   Q    Never heard his name?

13   A    No, ma'am.

14   Q    He'd never been brought up in conversation by

15   nickname or any other way.  Is that correct?

16   A    No, not --

17   Q    The first time you've seen Mr. Davis is on the

18   27th at the -- in this parking lot.  Correct?

19   A    Yes.  That's correct.

20   Q    And you've indicated that your purpose for that

21   meeting, in your mind, you wanted the people who were

22   part of what was described as the crew to see your

23   face.

24   A    Yes.  That's correct.

25   Q    Okay.  But the people who came there, they had a

Richard Jury-Cross Exam/Ms. Mannerino 12-13-2010

1  purpose also. Is that correct?

2  A    Yes.

3  Q    They wanted to find out what you had to say.

4  Isn't that right?

5  A    I can't speak for what they're actions were.

6  Q    Well, I mean doesn't Mr. Davis say to you a

7  number of times during that meeting, what's your plan?

8  What's your plan?

9  A    Yes, he does.

10  Q    Okay. And your purpose, also at that meeting,

11  was to get them to leave that location and go to

12  another location. Correct?

13  A    Yes. That's correct.

14  Q    They did not want to do that. Is that correct?

15  A    Yes. Michael Davis and Deaunte Patrick did not

16  seem inclined to leave that location.

17  Q    Mr. Davis was not inclined to leave that location

18  at all. Is that correct?

19  A    That would be correct.

20  Q    As a matter of fact, the last thing Mr. Davis

21  says to you is:

22      I don't see no reason to be in a rush to go

23      right there.

24      He's not leaving that location. He tells you

25      that, right?

Richard Jury-Cross Exam/Ms. Mannerino 12-13-2010

1   A    Yes.  That's correct.

2   Q    That's the last thing he says to you before he

3   walks away and goes down to the store, right?

4   A    That's correct.

5   Q    He goes into the store.  Right?

6   A    Yes.

7   Q    He purchases something, walks out.  Correct?

8   A    That's correct.

9   Q    And when he comes out of that store, he goes

10  back, gets in the car.

11       He doesn't even come back up to you and say

12  anything else to you.  Is that correct?

13  A    That would be correct.

14  Q    And even after Mr. Davis comes out of the store,

15  goes, gets in the car, you're still trying to get

16  those people to leave that location.  Is that right?

17  A    That's correct.

18  Q    And you're not convinced they're following you

19  anywhere, are you?

20  A    I was convinced when I was leaving the location

21  that they were following.

22  Q    Well, because you keep asking.

23       As a matter of fact, in the three or four or five

24  pages of the transcript that go on after Mr. Davis goes,

25  gets in the car, you ask a number of times are you guys

Richard Jury-Cross Exam/Ms. Mannerino 12-13-2010

1   following me?  Are you following me?

2        Is that correct?

3   A    I believe that would be accurate, yes.

4   Q    As a matter of fact, right before everybody

5   leaves you say to them:

6        I mean you guys load up and follow me or what.

7        Is that what you you say to them?

8   A    Yes.  I believe that's correct.

9   Q    I'm sorry.  I'm wrong.  Even after that you say

10  couple a more times:

11       You guys coming?  You guys coming, right?

12  A    Yes.  Prior to leaving the location, I asked if

13  they were following me.  And Demondre Martin said yes.

14  Q    The last things you say is:

15       You know, I'm ready, man.

16       And according to your transcript, Mr. Martin

17       says:

18       I follow you?

19       And you say, yeah.  Right?

20       That's the end of the conversation.

21  A    I believe so.  I'd have to look at the

22  transcription.

23  Q    All right.  And then at that point they get into

24  the car and --

25  A    They were already in the car.

Richard Jury-Cross Exam/Ms. Mannerino 12-13-2010

1   Q    All right.  They head the other way?

2   A    They initially followed me out of the parking

3   lot, then went the other way, yes.

4   Q    The -- you had originally had a meeting with

5   somebody that you thought was a person by the name of

6   Mr. Winans.  Is that right?

7   A    That's correct.

8   Q    And you had thought that Mr. Winans was going to

9   be a part of that.  Is that correct?

10  A    Yes.

11  Q    And on the 27th of May, Mr. Winans was not part

12  of the crew that showed up.  Is that right?

13  A    That's correct.

14  Q    Did you ask about that?  Did you ask anybody

15  where Mr. Winans was?

16  A    No, I did not question them.

17  Q    Did you know where Mr. Winans was?

18  A    No, I did not.

19  Q    Did you have any inclination, prior to the 27th,

20  that Mr. Winans wasn't going to be any part of this?

21  A    No.  I still believed he would have been present

22  there.

23  Q    That's what you thought?

24  A    Yes.

25  Q    You don't know what Mr. Winans was thinking or

Richard Jury-Cross Exam/Ms. Mannerino 12-13-2010

1  the person you've identified as Mr. Winans?

2  A    Yes.  That's correct.

3  Q    You don't know whether or not Mr. Winans didn't

4  want any part of your plan?

5  A    The individuals -- not Mr. Winans.

6       But the individual I believe was Mr. Winans, yes.

7  That's correct.

8  Q    He didn't want any part of your plan.

9  A    I have no -- I have no idea what occurred with

10  that situation, counselor.

11  Q    You didn't ask?

12  A    No, I did not.

13  Q    You didn't care why Mr. Winans wasn't part of

14  this?

15  A    I'm sorry?

16  Q    You didn't care why -- the individual who you

17  identified as Mr. Winans didn't want any part of this?

18  A    I did care, but I was interacting with the other

19  individuals who did arrive.

20       So I did not question Demondre Martin where the

21  presence of that individual was.

22       MS. MANNERINO:  So -- strike that.  Nothing

23  further.

24       THE COURT:  All right.  Let me ask a few questions

25  here, if you don't mind, Mr. O'Brien.

Usa v Martin, et al 10-20346

Richard Jury-Examination/the Court 12-13-2010

1       MR. O'BRIEN:  Sure.

2       MR. SCHULMAN:  I'll waive his appearance.

3                    EXAMINATION

4       THE COURT:  Can somebody assist Mr. Patrick?

5       As I understand it, the entire sum and scope of

6  these transactions went about like this.

7       You had a C.I. who was paid roughly $6,000 to go

8  out find people involved in drugs and other -- and

9  firearms crimes.  Right?

10      THE WITNESS:  That's correct.

11      THE COURT:  He comes to you and tells you that he's

12  got some folks -- after some back and forth with them,

13  he's got some folks who will do a home invasion, right?

14      THE WITNESS:  That's correct.

15      THE COURT:  And, ultimately, he produces Mr.

16  Martin.

17      THE WITNESS:  That's correct.

18      THE COURT:  All right.

19      When you finally get together with Mr. Martin, you

20  find out that he, CI-85, had told Mr. Martin, according

21  to what transpired in your conversation with Mr. Martin,

22  was that there were going to be some home invasions.

23      But that Mr. Martin apparently had been led to

24  believe that the home invasion by CI-85 -- had been lead

25  to believe the people at the home were not going to have

Usa v Martin, et al 10-20346

Richard Jury–Examination/the Court 12-13-2010

1  any guns initially.

2       THE WITNESS:  I'm not a hundred percent sure of

3  what occurred on that.

4       I believe that based on what Demondre Martin told

5  me, he believed initially that there was going to be a

6  stash house that he had a key for.

7       Whether he believed there's anybody present there,

8  I don't know.

9       THE COURT:  A stash house, a key and no guns.

10       THE WITNESS:  That's a possibility.  Yes, Your

11  Honor.

12       THE COURT:  Apparently at some point, particularly

13  at the March 25th meeting that you had with Mr. Martin,

14  you disabused him of that idea.  Is that right?

15       THE WITNESS:  Would be on March 12, 2010 is when we

16  discussed the presence of firearms at the location.

17       THE COURT:  Did that happen at the March 12th

18  meeting or at the March 25th meeting?

19       THE WITNESS:  It initially was discussed on the

20  March 12, 2010.  I advised there was an individual with

21  a shotgun in the residence.

22       THE COURT:  He did he express surprise?

23       THE WITNESS:  No, he did not, Your Honor.  He

24  discussed a possibility of gun smoke due to the presence

25  of firearms.

Richard Jury-Examination/the Court 12-13-2010

1      THE COURT:  That was the March 12th meeting in

2   which he said there might be some gun smoke.

3      THE WITNESS:  Yes.

4      THE COURT:  That was in response to your telling

5   him that this wasn't a simply a stash house.

6      Somebody was going to give you a key.  And there

7   might be somebody with a shotgun there?

8      THE WITNESS:  Yes.  I advised there was anywhere

9   between three to five individuals.  I know one

10   individuals always had a shotgun at the location.

11      THE COURT:  Then at the March 25th conversation,

12   there was an indication that if there were people

13   guarding the house, it could get dirty or ugly --

14      THE WITNESS:  Yes, sir.

15      THE COURT:  -- or bloody --

16      THE WITNESS:  Yes, Your Honor.

17      THE COURT:  -- right?

18      Conversations after that with Mr. Martin, did those

19   involve firearms?

20      THE WITNESS:  The conversation on --

21      THE COURT:  I realize that you said in the parking

22   lot you said:

23      Your boys -- talking about sitting there

24      strapped with burners in this parking lot.

25      You said that, right?

Usa v Martin, et al 10-20346

Richard Jury-Examination/the Court 12-13-2010

1          THE WITNESS:  That's correct.

2          THE COURT:  But apparently Mr. Patrick had said

3    earlier:

4          We ain't dirty.  We're good.

5          Whatever that meant.  Right?

6          THE WITNESS:  That's correct.

7          THE COURT:  You saw no guns that morning,

8    afternoon, evening?

9          THE WITNESS:  That's correct.  Earlier in the -- in

10   the day at around 12 p.m. I'd spoke with Mr. Martin on

11   his -- he had contacted me on my cellular telephone,

12   advised me the individuals he was bringing, one of them

13   in particular, did not want anybody living.

14         And he further stated in that conversation that

15   they were going to smoke the individuals in the house.

16         THE COURT:  That was May 27th?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Your concern in having them move

19   locations on May 27th was if you did the take down in

20   the parking lot off of Telegraph and I-96, that somebody

21   might get hurt.  The public might get hurt.

22         THE WITNESS:  Yes, sir.  It's a busy parking lot.

23         THE COURT:  So you wanted to move the site north to

24   this area of Telegraph and Fenkell?

25         THE WITNESS:  Yes, sir.

Richard Jury-Examination/the Court 12-13-2010

1      THE COURT:  Who made the decision to do the stop?

2      THE WITNESS:  I believe the on sign --

3   on-the-scene supervisor was a group supervisor.  Sheila

4   Clifton was on the scene.

5      THE COURT:  Did she consult with you as to whether

6   or not they should stop the people?

7      THE WITNESS:  I was questioned whether or not there

8   were firearms in the car.

9      I said I believe there was, based on the

10  conversation the prior meetings and individuals showing

11  up at the location.

12     THE COURT:  At the time, at the time you made the

13  decision to do the stop, you didn't think they were

14  still following you, did you?

15     THE WITNESS:  No.  That that point I attempted to

16  reach out to him several times.

17     I saw him spinning around, doing the Michigan left,

18  heading in the opposite direction.  I did not believe

19  they were following.

20     THE COURT:  Also, you were trying to call him.

21  That's a pretty good sign he's not following you, right?

22     THE WITNESS:  Yes, sir.

23     THE COURT:  At the time you made the decision to do

24  the stop, had the statements of Mr. Martin about the

25  earlier statements, the March 12 statement and the

Richard Jury-Examination/the Court 12-13-2010

1  statement earlier May 27th --

2      THE WITNESS:  Yes.

3      THE COURT:  -- somebody might get smoked --

4      THE WITNESS:  Yes, sir.

5      THE COURT:  -- or words to that affect?

6      THE WITNESS:  Yes, sir.

7      THE COURT:  Anything else?  This is what led you to

8  believe that they might be carrying guns.  Right?

9      THE WITNESS:  Yes, Your Honor.

10     Based on the fact that they were -- based on my

11 belief that they were showing up to go commit an armed

12 home invasion, that they would be utilizing firearms to

13 conduct a home invasion.

14     THE COURT:  You had discussed doing a home invasion

15 directly with Mr. Martin at this point?

16     THE WITNESS:  Yes.

17     THE COURT:  Starting with the March 12 meeting?

18     THE WITNESS:  Yes, sir.

19     THE COURT:  At this point, were you relying on

20 anything that the confidential informant had told you

21 about it?

22     THE WITNESS:  Based on the conversation that they

23 had, that he advised he had a crew of individuals that

24 do home invasions and they were wanting a location, a

25 stash house location, to do a home invasion on.

Richard Jury-Examination/the Court 12-13-2010

1      THE COURT:  But you had discussed specifically,

2  however, yourself with Mr. Martin, doing this home

3  invasion.

4      That was the whole purpose of your meeting with him

5  March 12.

6      THE WITNESS:  Yes, sir.

7      THE COURT:  Then again on March 25th?

8      THE WITNESS:  Yes.

9      THE COURT:  Then this conversation that started up

10  again April 7, I believe?

11      THE WITNESS:  Yes.

12      THE COURT:  Was there any other basis you're aware

13  of to conduct the stop of their car on May 27th?

14      THE WITNESS:  I believed that based off the -- my

15  knowledge of the previous meetings and the conversations

16  I had as far as them conducting the home invasion, I did

17  not believe that they would show up without firearms to

18  conduct the home invasion.

19      THE COURT:  What did you make of the fact they

20  peeled off?

21      THE WITNESS:  I wasn't sure, Your Honor.

22      I didn't know if they had spotted one of my

23  surveillance vehicles, if somebody -- the individuals in

24  the vehicle got hinky of the situation.

25      Due to the fact that he was not picking up my phone

 1   calls, I didn't know what occurred at that point.

 2       THE COURT:  Mr. O'Brien, do you have anything else?

 3       MR. O'BRIEN:  No, Your Honor.

 4       THE COURT:  Any follow up from defense counsel to

 5   my questions?

 6       MR. MAGIDSON:  No, Your Honor.

 7       MR. SCHULMAN:  No, Your Honor.

 8       MR. THOLEN:  No, Your Honor.

 9       MS. MANNERINO:  Nothing further.

10       THE COURT:  You can step down, sir.

11            (The witness excused at 3:44 p.m.)

12       THE COURT:  What's Agent Holt going to tell me I

13   need to know?

14       MR. O'BRIEN:  That he was present when the car was

15   stopped.  And that four individuals were taken into

16   custody, the vehicle was transported to a police station

17   and it was searched.  They were arrested for the

18   conspiracy.

19       THE COURT:  Any of that in controversy?  Any of

20   that in controversy?

21       MR. MAGIDSON:  No, Your Honor.

22       THE COURT:  And that they had guns in the car?

23       MR. O'BRIEN:  Then although I guess up to the point

24   of the search, whatever was there was there.

25       THE COURT:  Whatever was there was there.

 1         The question is whether they had probable cause to

 2    stop them.

 3         MR. O'BRIEN:  Or reasonable suspicion.

 4         THE COURT:  Or reasonable suspicion.

 5         MR. O'BRIEN:  Right.

 6         THE COURT:  I don't think I need to hear from Agent

 7    Holt.

 8         MR. O'BRIEN:  That's fine, Your Honor.

 9         THE COURT:  Unless -- do any of the defendants want

10    to hear from him?

11         MR. MAGIDSON:  No, Your Honor.

12         MR. SCHULMAN:  No, Your Honor.

13         MR. THOLEN:  No, Your Honor.

14         MS. MANNERINO:  No.

15         THE COURT:  Doesn't sound to me like his testimony

16    goes to probable cause of the stop.

17         MR. O'BRIEN:  Very well, Your Honor.  Just the

18    circumstances of it, whether or not there was an issue

19    of whether or not they wanted to question him about

20    whether or not the defendants were taken from the

21    vehicle.  But I think we agree to that.

22         THE COURT:  Any question from the defense about the

23    accuracy of the statements that are on the actual

24    transcripts?

25         Mr. Magidson, you've had an opportunity to review

1    the transcripts against the tapes, right?

2         MR. MAGIDSON:  Yes, Your Honor.

3         THE COURT:  Any question about the accuracy?

4         I say this because what I propose to do is to go

5    back and listen to the tapes, compare them to the

6    transcripts.  Not all of them, but just the relevant

7    ones that I've indicated here.  And then try to make a

8    determination, first, as to whether statements are

9    accurate.

10        And, second, whether or not the statements taken

11   together in their entirety provide a basis for the stop.

12        MR. MAGIDSON:  The comparisons I've made, Your

13   Honor, I've not detected any significant discrepancy.

14        There's -- some things are easier to understand

15   then others as you would normally expect.  But I didn't

16   see anything that -- where one was white, one was black.

17        A ha.  I've got you there.  I didn't see anything

18   like that.

19        THE COURT:  Okay.

20        MR. O'BRIEN:  I would indicate, judge, that where

21   the speech on the tape is so garbled it's difficult to

22   tell what's being said, the transcript reflects the word

23   "unintelligible".

24        THE COURT:  And there was some question about who

25   had said we ain't dirty, we're good.

                    Usa v Martin, et al 10-20346

1          Have you had a chance to review the tape of the

2     transcript, Mr. O'Brien, and assure yourself that, in

3     fact, it was Mr. Patrick who said it?

4          MR. O'BRIEN:  Yes, Your Honor.

5          I agree with Mr. Schulman in terms of what you can

6     view on the video recording and the circumstances of

7     where the people were positioned.

8          THE COURT:  Okay.

9          MS. MANNERINO:  For purposes of -- I have discussed

10    it with Mr. Davis.

11         For purposes of this proceeding, I will not dispute

12    the transcripts or the accuracy.

13         If this case does, in fact, proceed to trial, I

14    reserve the right to challenge what may be some

15    inaccuracies for trial purposes.

16         THE COURT:  Mr. Tholen?

17         MR. THOLEN:  I guess I'll take the same position

18    that she just did, Your Honor.

19         THE COURT:  All right.  Let me take it under

20    advisement.  We'll get an opinion out.  It's

21    interesting.

22         All right.  We'll get an opinion out.  In the

23    meantime, we have a trial date, don't we?

24         MR. O'BRIEN:  Tomorrow, judge, was the original

25    date.

                    Usa v Martin, et al 10-20346

1          THE COURT:  What are we --

2          MR. O'BRIEN:  It was adjourned -- I'm sorry.  It

3     was tomorrow.  It was originally tomorrow.  It was

4     adjourned until the decision was made on this particular

5     motion.  I believe at the last motion hearing you

6     indicated you want this issue to be decided.

7          And if the Court would were to find that the trial

8     date has to be adjourned, because this is critical to

9     whether or not the trial can even proceed, then the

10    speedy trial clock would be tolled.

11         THE COURT:  Counsel ready to go to trial tomorrow?

12         MR. O'BRIEN:  Pardon me?

13         THE COURT:  Counsel ready to go to trial tomorrow?

14         MR. O'BRIEN:  The Court told us there would not be

15    a trial date tomorrow.  So, no.

16         THE COURT:  I wasn't planning on holding the trial.

17    But what I'm trying to think is whether or not, if I

18    were to suppress the evidence, there wouldn't be much of

19    a case left.

20         MR. O'BRIEN:  Well, the government's position,

21    judge, is that the crime the defendants committed was

22    conspiracy to commit an armed home invasion and whether

23    or not the evidence inside the vehicle disables that

24    particular crime and whether or not the four of them

25    arriving in the parking lot is a substantial step

                    Usa v Martin, et al 10-20346

1  towards that conspiracy is an issue left to be resolved

2  probably by people on a floor different then mine.

3       THE COURT:  Okay.  We'll adjourn the trial and

4  we'll give you a trial date probably be in January.  And

5  we'll get an opinion out on this issue of the stop.

6       MR. O'BRIEN:  Can I leave this with the Court?

7       THE COURT:  Thanks.  Anything else?

8       MR. O'BRIEN:  Nothing from the government, Your

9  Honor.

10       MR. MAGIDSON:  Nothing further, Your Honor.

11

12            (This hearing then

13            concluded at 3:50 p.m.)

14

15            CERTIFICATE OF COURT REPORTER

16

17

18

19    I certify that the foregoing is a correct transcript

20    from reported proceedings in the above-entitled

21  matter.

22

23

24

25  s/Carol S. Sapala, FCRR, RMR        December 15, 2010

                    Usa v Martin, et al 10-20346