UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                    No. 10-CR-20346

vs.                                         Hon. Gerald E. Rosen

DEMONDRE LEVELLE MARTIN, et al.,

                    Defendants.
_____/

OPINION AND ORDER REGARDING
<u>DEFENDANT MARTIN'S MOTION TO SUPPRESS EVIDENCE</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____January 28, 2011_____

PRESENT:  Honorable Gerald E. Rosen
                       Chief Judge, United States District Court

## I.  <u>INTRODUCTION</u>

On June 8, 2010, the Grand Jury returned a two-count indictment charging

Defendants Anthony Pope, Demondre Level Martin, Michael Deon Davis, Deaunte

Lorenzo Patrick and Elrico Laquan Welch with "Conspiracy to Possess with Intent to

Distribute a Controlled Substance" in violation of 21 U.S.C. § 846, and charging

Defendants Martin, Davis, Patrick and Welch with Possession, and Aiding and Abetting

the Possession, of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of

18 U.S.C. § 924(c)(1)(A).  The charges against the Defendants arose out of a Government

"sting" operation involving undercover ATF agents and a registered ATF confidential informant.

This matter is presently before the Court on Defendant Martin's Motion to Suppress Evidence in which Martin seeks an Order suppressing the handgun found during the inventory search of the car he was driving following a traffic stop effectuated by the Michigan State Police on the Jeffries Freeway in Detroit the evening of May 27, 2010.  Defendants Patrick, Welch and Davis, who were passengers in the car, have joined in Defendant Martin's motion.

The Court conducted an evidentiary hearing on this matter on December 13, 2010 at which it heard the testimony of ATF Special Agent Richard Jury.  The Court also received into evidence several audio and video recordings (and unofficial transcripts of these recordings) of Agent Jury's conversations and meetings with Defendants on March 12, March 25, April 4, May 25 and May 27, 2010.

Having heard the testimony of Agent Jury, and having reviewed and considered the audio and video recordings, the transcripts thereof, the parties' briefs and the oral arguments of counsel, the Court is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

In February 2010, an ATF paid confidential informant ("CI-85") contacted ATF Special Agent Richard Jury and informed Jury that he had spoken with an individual named "Tony," whom CI-85 knew to be a drug dealer.  "Tony" was later identified by the

ATF as Defendant Anthony Pope.[1]  The CI told Jury that Pope wanted to arrange home invasions of other drug dealers' stash houses, and asked the CI if he could provide him with information on potential targets, because he had a crew that could conduct a home invasion of a stash house.  Agent Jury was not convinced that Pope was serious so he directed the CI to let him know if he was contacted again by Pope so that it could be looked into further.

On February 20, 2010, CI-85 again contacted Jury.  This time, the CI told Jury that he had been told by Pope that "Dre" (Defendant Demondre Martin) wanted to talk to him about doing such a home invasion.  According to Jury, the CI, in turn, contacted Defendant Martin who supposedly had told the CI that he had a crew to do a home invasion.  Agent Jury directed the CI to arrange a meeting for him with Defendant Martin.

Agent Jury testified that he did a criminal history check of Demondre Martin and found that Martin had a criminal history.  However, none of his criminal history involved armed robberies, home invasions or firearms.[2]

On March 12, 2010, Agent Jury, acting undercover, met with the CI and Defendant Martin in the parking lot of the United Café on Grand River in Detroit.  Jury testified that at this meeting, he told Martin that he had been working as a drug runner for large scale

---

[1]  Pope has several prior controlled substance convictions.

[2]  At the time, Martin had one prior conviction for criminal sexual conduct and one pending narcotics charge.  *See* Michigan Offender Tracking System ("OTIS") at www.state.mi.us.mdoc/asp/otis2profile.asp?mdocNumber=251941.

cocaine trafficker who he felt was cheating him and that he wanted to find a crew that would rob one of his employers' stash houses when the next shipment of cocaine came in. This meeting was recorded, *see* Government Ex. 5, and the recording was subsequently transcribed by Jury.  *See* Government Ex. 5A.

During the course of the meeting, Jury told Martin that, although the location of the stash house changed with each shipment, there are typically three or four other individuals at each house one of whom is "this big fat Mexican dude that is always sitting on the couch [with] a shotie right next to him."  *See* Ex. 5A, p. 3.  Upon hearing about the other individuals and the Mexican with the shotgun, Martin responded:

> There is gonna have to be some gunsmoke...'cause no way that...like this is their job to protect this guy's shit...so they see anything coming in...they gonna get to shooting.

*Id.* at p. 6.

When Jury asked Martin if his guys would be able to handle that, Martin responded, "Man that ain't no problem 'cause we gonna save our own lives."  *Id.* After discussing the details of the proposed home invasion, Jury and Martin exchanged phone numbers and the meeting ended.

On March 22, 2010, Martin called Jury asking for more details about Jury's proposed home invasion.  The two agreed to meet on March 25th.

On March 25, 2010, Jury met Martin and another individual identified as "Bee,"

who was thought to be Orvis Winans,[3] at the United Café. The meeting lasted 55 minutes. At this meeting, Jury discussed with Martin and Winans how they would conduct the home invasion and how the drugs and money found in the house would be divided. This meeting was also recorded and the recording was later transcribed by Jury. [*See* Government Ex. 1 and 1A.] Martin told Jury that the home invasion would be committed by him, Winans and a third unidentified person. Much of the discussion of how the home invasion would be carried out, however, was between Jury and Winans, only. (Martin left the meeting after about a half an hour. *See id.*) As in his earlier meeting with Martin, Jury reiterated to Winans his description of the Mexican with the shotgun and told him it was possible others in the house might have weapons on them, but stated that he'd seen no other weapons himself. *See* Ex, 1A p. 3. Winans told Jury that what he proposed to do was to get all of the drug dealer's men in one room, tie them up, and clean out the house. *Id.* at 16. He assured Jury that they would not hurt anybody unless they had to: " I'm saying it can be prevented." *Id.* at p. 20.

Jury's next contact with Defendant Martin was on April 7, 2010. Jury testified that on that date, he called Martin to just touch base with him. The phone conversation was recorded and transcribed. [*See* Government's Ex. 2 and 2A.] During this phone conversation, Jury told Martin that he felt a lot better after talking to his guy [Winans];

---

[3] Jury testified that at the time that charges were brought against the Defendants in this case, he had believed that "Bee" was Orvis Winans, a previously-convicted narcotics trafficker, but he has since determined that Winans was not this individual. Bee's identity remains unknown.

"he seems like he knew what the f*** he was doing.  You know what I mean?"  Ex. 2A, p.1.  Martin responded:  "Oh... that's what he do, man.  That's what he do.  That's why I say...that's what he live for.  I ain't gonna lie to you...so..they're into this lick [i.e., home invasion].  That's what they do."  *Id.*  Jury acknowledged, however, that during this April 7 conversation, there was no mention whatsoever of firearms.  *See* 12/13/10 Hrg. Tr., p. 15.  Jury had no further contact with Martin after this phone conversation for the next seven weeks.

On May 25, 2010, Jury called Martin and told him that he had been contacted by his employer and that a multi-kilogram shipment of cocaine was coming in two days.  This conversation was recorded and transcribed.  [*See* Government's Ex. 3 and 3A.]  Jury told Martin to get his crew together and that they should meet either the next day or the day the shipment arrived so that everyone would recognize Jury and would know what the plan was.  Jury testified that there was no discussion during this May 25 conversation of any anticipated violence or the use of any firearms during the home invasion.  The conversation ended with Jury telling Martin that the group would meet at 5:00 p.m. on May 27.  *Id.*

Martin called Jury around noon on May 27 to confirm that everything was still on for that evening.  This conversation was recorded and transcribed.  [*See* Government's Ex. 3 and 3A.]  Jury confirmed that the drug delivery was still on as scheduled.  He told Martin that he would call him between 4:30 and 5:00 p.m. and for him to have his crew

ready to meet between 5:00 and 5:30 p.m.  *Id.* Martin told Jury that he anticipated he

would have "Winans" ("the guy you met") as one of the members of the crew but that he

was also going to have with two or three men with him whom Jury had not met, and that

they would have to "get a visual" of Jury before the home invasion.  *Id.*

Martin expressed concern about his cell phone being tracked and he wanted to

make sure that the plan was "airtight" because he did not want to go back to prison. He

was also concerned because "his main man" had been talking about not "leav[ing]"

anybody living" and "leaving them guys smoked."  *Id.*  Jury told Martin that he, too, was

nervous, and that that was why he had arranged with his cousin to use one of his

warehouses in Northwest Detroit so that they could get off the street and have a place to

store their cars during the home invasion.  *Id.*

Jury had a few brief phone conversations with Martin later that afternoon

concerning getting the crew together and the location of the meeting.  Finally, at

approximately 6:00 p.m., Jury met with Martin in a strip mall parking lot on the service

drive of I-96 and Telegraph Road in Detroit.  Martin was accompanied in the vehicle he

was driving by Defendants Welch, Davis and Patrick.  Jury had never before met Welch,

Davis or Patrick and knew nothing about them.  "Winans," who had laid out the plans for

the home invasion with Jury on March 25th, was not with the group.  The meeting was

recorded and transcribed.  [*See* Government's Ex. 4 and 4A.]  After outlining the plan for

the home invasion, Jury tried to get the group to agree to follow him down Telegraph to

"his cousin's shop" to wait for the call from his "employer" but Davis resisted saying he felt more comfortable waiting in the parking lot because his "people" owned the adjacent bar. Jury told the men that he was uncomfortable staying in the parking lot with them "strapped up with burners." Patrick, however, assured him "We ain't dirty," which Jury testified was street vernacular for "we don't have guns [on us]." [*See* 12/13/10 Tr. pp. 47, 59. 80.][4]

Patrick and Davis then went to a  liquor store in the adjacent strip mall and when they returned, Jury, apparently thinking that he had convinced the men to change locations, directed them to follow him in Martin's vehicle to the secondary location. Jury got into his own vehicle and directed Martin to follow him to his cousin's shop on Fenkell and began to travel north on Telegraph toward Fenkell. Martin exited the parking lot behind Jury but did not follow him down Telegraph. Instead, Martin got onto I-96 and headed East on the freeway toward Downtown Detroit.

After Jury had traveled a short distance down Telegraph, he called his surveillance agent to find out what had happened to the Defendants. Jury's conversation with the surveillance agent was recorded but not transcribed.[5] The conversation, however, is

<hr>

[4] Although he testified on direct examination that Patrick had said "we ain't dirty," later in the hearing, during the cross-examination by the second of the four defense attorneys, Jury testified that he never heard Patrick say "we ain't dirty" at the time of the meeting; that he only heard that when he went back and reviewed the video recording of the meeting. *See* 12/13/10 Tr. p. 81.

[5] Jury, who prepared the transcripts of all of the conversations/meetings with Martin, indicated on the May 27, 2010 transcript with regard to his conversation with the

audible on the recording:

> Jury:  Hey.
> Hello.  Are they just sitting there?
>
> Surveillance Agent: No.  They came out on [inaudible], and they turned back around.  They're either going on the freeway or going back to the parking lot. . . . *Do you think they've got their guns?*
>
> Jury:  *Uh,* ***I don't know****.  I would think they do,* ***but I don't know****.*
>
> Surveillance Agent: They're on the freeway. . . .
>
> Jury:  Let me try to call them again.  [Phone ringing; no answer.]  I think we're going to have to traffic stop them, man.
>
> Surveillance Agent: As long as they've got their stuff.
>
> Jury:  Alright.

[Government Ex. 4 at 18:50:05 - 18:51:24 (emphasis added).]

Michigan State Police Troopers effectuated a traffic stop of Martin's vehicle on eastbound I-96.  It is undisputed that Martin was not speeding or violating any other traffic laws at the time.  According to Agent Jury, the on-scene supervisor, Sheila Clifton, made the decision to do the traffic stop after Jury told her that he believed there were firearms in Martin's car.  Jury, however, admitted that he had never seen a gun on Defendant Martin at any time when they met and never saw a bulge in a hip pocket that would lead him to suspect that Martin had a firearm on him on May 27th.  He further

_____

surveillance agent only "*S/A Jury has general conversation with surveillance members*."
[*See* Ex. 4A, p. 7].

admitted that firearms were never specifically mentioned by Martin.   Jury further

admitted that he had not seen any guns on any of the other Defendants whom he had just

met for the first time an hour earlier.  Jury testified that he based his belief that there were

firearms in Martin's vehicle on (1) Martin's statement on March 12, 2010, more than two

months earlier, that "there is gonna have to be some gunsmoke"; (2) Martin's statement

earlier in the day on May 27th that one of his associates had talked about not "leav[ing]

anybody living" and "leaving them guys smoked;" and (3) the fact that the Defendants

showed up at the parking lot.   [12/13/10 Tr. p. 107-08.]

     After they were stopped, the Defendants were ordered out of the vehicle and

immediately placed under arrest and taken into custody.  *See* Government's Response

Brief, Dkt. # 81, p.. 9; *see also* 5/28/10 Affidavit of ATF Special Agent Joseph Nether,

Dkt. # 1, ¶ 21.   Martin's vehicle, meanwhile, was moved from the shoulder of the

freeway and transported to a police station where it was searched.  *Id.*  No warrant was

obtained prior to the search.  The search revealed one .45 caliber semi-automatic pistol,

three sweatshirts, a tee shirt and six cell phones.  *Id.*

     Defendants now move to suppress the evidence.

### III.  DISCUSSION

     The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."

U.S. Const. amend. IV.  Under the Fourth Amendment, police officers may stop a vehicle

if they have a reasonable suspicion of criminal activity.  *United States v. Flores*, 571 F.3d

541, 544 (6th Cir. 2009).  "Reasonable suspicion" requires less proof than "probable

cause," but it must be "'more than an inchoate and unparticularized suspicion or hunch.'"

*United States v. Garrido*, 467 F.3d 971, 981 (6th Cir. 2006) (quoting *United States v.*

*Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989).

  In determining whether reasonable suspicion exists, the court must look at the

"totality of the circumstances" to determine whether the officer had a "particularized and

objective basis" to suspect legal wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273,

122 S.Ct. 744 (2002).  The totality-of-the-circumstances analysis "allows officers to draw

on their own experience and specialized training to make inferences from and deductions

about the cumulative information available to them 'that might well elude an untrained

person.'"  *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quoting *Arvizu*,

534 U.S. at 273); *accord Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868 (1968) ("[T]he

police officer must be able to point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion. . . .  Anything

less would invite intrusions upon constitutionally guaranteed rights based on nothing

more substantial than inarticulate hunches. . . .").

  Although the reasonable-suspicion calculation examines the totality of the

circumstances, even where the government points to several factors that the courts have

recognized as valid considerations in forming reasonable suspicion, they may not always

11

provide reasonable suspicion, particularly if they are relatively minor and subject to significant qualification.   *United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2008)*, cert. denied*, 129 S.Ct. 2887 (2009).  The "reasonable suspicion" determination, thus, is ultimately a mixed question of law and fact (or, in other words, an application of law to fact), by which the court determines whether the facts surrounding the officer's determination are of sufficient legal significance to constitute reasonable suspicion. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).

Applying the foregoing principles, the Court finds that the officers lacked reasonable suspicion to effectuate the traffic stop of Defendant Martin's vehicle on May 27, 2010.  The Government does not dispute that Martin was not speeding or violating any other traffic laws at the time.  Furthermore, Agent Jury was obviously aware before stop that Defendants had by then already decided not to follow through with Jury's plans for the "home invasion" that night.  They had chosen not to follow him, turned in the opposite direction, got on the freeway and headed for Downtown.

Jury testified that his on-site supervisor decided to do a traffic stop after Jury told her that he believed that guns would be found in the car.  However, if Jury indeed had such a belief -- which the recorded conversation between Jury and his Surveillance Agent does not bear out -- it was not a *reasonable* one.  When specifically asked by the Surveillance Agent, "Do you think they've got their guns?", Jury expressed doubt and responded, "***I don't know***.  I would think they do, but ***I don't know***."

Notwithstanding his expression of doubt to the Surveillance Agent, Jury testified at the evidentiary hearing that he told the on-the-scene commanders that he believed there were firearms in the vehicle. [12/13/10 Hrg. Tr., p. 49.] He further testified that he based his belief that guns would be found in the car on two statements concerning the possibility of gunfire during Jury's proposed home invasion -- one by Martin two months earlier and one by an unidentified associate of Martin (who may or may not have been among the individuals who accompanied Martin to the parking lot) earlier in the day -- and the simple fact that the Defendants showed up to meet with him in the parking lot at Telegraph and I-96 to await a phone call from Jury's fictitious drug-dealer employer. Given Jury's expression of doubt minutes before the stop, the Court is unpersuaded that the gunfire statements together with the appearance of the Defendants at the parking lot are sufficient to provide a reasonable suspicion that guns would be found in the car.

The first of the statements relied upon by Jury was made by Martin the first time the two met on March 12, 2010 when Jury described the fictitious stash house that he wanted Martin to find a crew to rob. Jury told Martin that the stash house was guarded by three men, a big Mexican with a shotgun on the couch in the front room and two men in the kitchen. Responding to that description, Martin said, "There is gonna have to be some gunsmoke...'cause no way that...like this is their job to protect this guy's shit...so they see anything coming in...they gonna get to shooting." [Government's Ex. 5 and 5A p. 6 (emphasis added).] In context, Martin's statement may reasonably be understood to mean that Martin believed the stash house guards as described would shoot at any

13

intruders.  In any event, ambiguity notwithstanding, this statement was more than two

months removed from the events of May 27.

　　　The second of the statements relied upon by Jury was certainly more proximate in

time; it was made earlier in the day on May 27.  During this conversation, Martin told

Jury that he anticipated having "Winans" ("my main man"; "the guy you met") with him,

and told jury, "[M]y main man who really put in play now like that. . . he talking like. . .

man, I ain't trying to leave anybody living." [Government Ex. 3 and 3A, part 2.]  Then,

later in that same brief phone conversation, expressing concern about Jury's loose plan,

Martin added, "Man, that's why I'm telling you man...see the thing about this...they

talking about leaving them guys smoked...."  *Id.*

　　　"Winans," however, was not one of the men Martin brought with him to the

parking lot. It had been "Winans" -- Martin's "main man" -- who had laid out plans for

the home invasion with Jury.  It was not reasonable for Jury to rely on what Winans had

said to Martin as the basis for his belief that guns would be found in Martin's car when

Winans was not among the men accompanying Martin to the parking lot.

　　　As for the Defendants' appearance at the designated meeting location, while Jury

testified that he did not think it would be likely that the Defendants would agree to meet

to do a home invasion without bringing firearms, this is pure conjecture and any such

belief should have been disabused when he did not see any of the Defendants with a gun

and when Defendant Patrick explicitly told him, "We ain't dirty," i.e., that they did not

have guns on them.   These facts, together with Jury's admission to his Surveillance

14

Agent that he did not know whether the Defendants had guns with them, persuade the Court that any suspicion Jury had that guns might be found in Martin's vehicle was not reasonable.

For all of the foregoing reasons, the Court concludes that the police lacked a reasonable articulable suspicion that firearms would be found in Martin's car so as to justify the traffic stop on May 27, 2010.

Even assuming *arguendo* that the police had a reasonable articulable suspicion to justify an investigative traffic stop, the police lacked probable cause to arrest Defendants and search the vehicle. "[W]hile an investigative stop must be supported by reasonable, articulable suspicion that criminal activity may be afoot, an arrest must be supported by probable cause." *United States v. Brown*, 51 F.3d 131 (8th Cir. 1995) (quoting *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir.1992), *cert. denied*, 507 U.S. 1011, 113 S.Ct. 1662 (1993)); *Michigan v. Summers*, 452 U.S. 692, 699-700, 101 S.Ct. 2587, 2593 (1981) ("[E]very arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause."). Probable cause is a more demanding standard than reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000). "'Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.1993) (*en banc*)), *cert. denied*, 549 U.S. 1030 (2006).

15

To determine whether police officers had probable cause to arrest, the court considers the totality of the circumstances and whether the "facts and circumstances" of which the police had knowledge at the moment of the arrest were "sufficient to warrant a prudent person . . . in believing . . . that" the seized individual "ha[d] committed . . . an offense." *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir.2002) (internal quotation marks omitted). Further, the belief of guilt must be particularized with respect to each person to be seized. *United States v. Romero*, 452 F.3d 610, 616 (6th Cir.2006), *cert. denied*, 549 U.S. 1237 (2007). Probable cause to search is similarly defined and is said to exist when there is "a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) (quoting *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir.2004)).

The Government here admits that "[w]ithin minutes of leaving the parking lot [at Telegraph and I-96] the Defendants were stopped ***and arrested***." Government's Response Brief, Dkt. # 81, p. 9. No arrest warrants had been issued. [12/13/10 Hrg. Tr., p. 76.][6] All four Defendants were immediately handcuffed and placed into various law enforcement vehicles and transported to a police station. *Id.* at pp. 77-78.

---

[6] Arrest warrants were not obtained until the next afternoon after the Defendants had already been taken into custody. [*See* Dkt. No. 2]. These warrants were based, not only on the facts known by the ATF agents and police officers at the time of the stop but also on Defendants' criminal histories and the evidence found in Martin's vehicle. [*See* Dkt. Nos. 1 and 2.] None of this additional evidence was known by the officers at the time Defendants were placed under arrest. *Id.*

As indicated, an arrest must be supported by probable cause.  *See United States v. Brown, supra.*  The Government relies upon the facts known up to the time of the stop to justify the Defendants' arrest.  The Court has already concluded that these facts are insufficient to give rise to a reasonable articulable suspicion.  Therefore, they can hardly be said to be sufficient to satisfy the more stringent "probable cause" standard.  No evidence was presented suggesting that anything occurred during the traffic stop that might have given rise to probable cause to arrest the Defendants or search their car.  *Compare United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir. 1993) (officer's reasonable articulable suspicion to stop defendant's vehicle developed into probable cause to search the vehicle when, upon approaching the vehicle, the officer detected the odor of marijuana).  The Government does not claim that any weapons or drugs were observed at the time of the stop.  Indeed, not even the Defendants' identities nor their criminal histories were known to the officers at the time.  "Of course, the 'existence of probable cause turns on the information known to the officers at the moment the arrest [was] made, not on subsequently received information.'" *United States v. Carrillo*, 269 F.3d 761, 766 (quoting *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir.2000)).  It is the Government's burden to establish the legality of a warrantless search by a preponderance of the evidence. *United States v. Domenech*, 623 F.3d 325, 331 (6th Cir. 2010) (citing *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir.2002)).  The Government has not met its burden here.

17

All that the arresting officers had to go on was Agent Jury's inferred subjective belief that firearms would be found in the car.   While an experienced agent such as Agent Jury may have a "gut feeling," this is legally insufficient. *See United States v. Cooper*, 1 Fed. Appx. 399, 403 (6th Cir. 2001).  Probable cause is measured by an objective standard.  *Warren v. City of Lincoln*, 864 F.2d 1436, 1439 (8th Cir.), *cert. denied*, 490 U.S. 1091 (1989); *United States v. Salinas-Calderon*, 728 F.2d 1298, 1300-01 (10th Cir.1984).  While the Court does not question Agent Jury's dedication to protecting the public and to act preemptively before risk becomes reality, this is simply one of those situations in which the law demands something more than an officer's instincts, no matter how well-intended.

The one firearm found in Martin's vehicle was found during an inventory search done after the vehicle was transported from the shoulder on I-96 to the police station.  *See* Affidavit of ATF Special Agent Joseph Nether, Dkt. # 1, ¶ 21; 12/13/10 Hrg. Tr., p. 110. No search warrant was ever obtained to search the vehicle.  *Id*., at p. 78.  Because Defendants' arrest on May 27, 2010 was not supported by probable cause, no valid inventory search could have been based on that arrest.  *United States v. Jenkins*, 876 F.2d 1085, 1089 (2d Cir. 1989); *see also United States v. Gorski*, 852 F.2d 692, 695 (2d Cir.1988) (inventory search is proper incident of defendant's *lawful* arrest and detention); *cf., Illinois v. Lafayette,*  462 U.S. 640, 648, 103 S.Ct. 2605, 2610 (1983) (if the government has legitimate custody of the property to be inventoried as a result of a

lawful arrest or by some other method, an inventory search is permissible).[7]

_____

[7] Agent Jury testified that he believed Defendant Martin's car was moved from the location of the stop simply because it could not be left on the expressway.  12/13/10 Hrg. Tr., p. 78.  The Government, however, has not relied on any "standard police procedures" that might prohibit leaving a vehicle on the shoulder of an expressway and require the towing and impounding of the vehicle (without an arrest of the driver or passengers) so as to provide some other legitimate basis for an inventory search.  *See e.g., South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092 (1976) (standardized police caretaking procedures designed to secure and protect vehicles and their contents provide legitimate basis for warrantless inventory searches of vehicles in police custody).  *See also Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738 (1987); *Florida v. Wells*, 495 U.S. 1, 110 S.Ct, 1632 (1990).  However, as *Opperman* and its progeny make clear, such a "standard procedure" inventory search may be invalidated if shown to be a pretext for concealing an investigatory police motive.  *Opperman*, 428 U.S. at 376.  *See also, Wells, supra* ("[A]n inventory search must not be a ruse for  general rummaging in order to discover incriminating evidence."  495 U.S. at 4); *Bertine, supra*, (inventory search cannot be used as "a purposeful and general means of discovering evidence of crime." 476 U.S. at 376 (Blackmun, J., concurring)).  Here, the traffic stop was ordered for one reason -- because the government believed firearms would be found in the car.  Clearly, the police were acting pursuant to an investigatory motive -- to find the guns -- when they transported the car to the police station and searched it. Under these circumstances, the "inventory search" exception to the warrant requirement does not apply.

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant Martin's Motion to Suppress

Evidence [Dkt. No. 65], in which Defendants Patrick, Davis and Welch have joined [Dkt.

Nos. 67, 73, 74], is GRANTED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  January 28, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 28, 2011, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager